# IN THE SUPREME COURT, STATE OF WYOMING

## 2015 WY 138

OCTOBER TERM, A.D. 2015

October 23, 2015

POSITIVE PROGRESSIONS, LLC, A
Wyoming Limited Liability Company,
NORTHERN DEVELOPMENTAL
DISABILITY SERVICE PROVIDERS,
INC., A Wyoming Corporation, and
NATHAN COOK,

Appellants
(Defendants),

v.

AMY LANDERMAN, f/k/a Amy Baxter,

Appellee
(Plaintiff).

POSITIVE PROGRESSIONS, LLC, A
Wyoming Limited Liability Company,
NORTHERN DEVELOPMENTAL
DISABILITY SERVICE PROVIDERS,
INC., A Wyoming Corporation, and
NATHAN COOK,

Appellants
(Defendants),

v.

AMY LANDERMAN, f/k/a Amy Baxter,

Appellee
(Plaintiff).

S-14-0250, S-14-0313

*Appeal from the District Court of Park County*
*The Honorable Robert E. Skar, Judge*

**Representing Appellants:**
     Deborah Ford Mincer*, Cheyenne, WY.

**Representing Appellee:**
     Stephen L. Simonton, of Stephen L. Simonton, P.C., Cody, WY.

*Before BURKE, C.J., and HILL, **KITE, DAVIS, and FOX, JJ.*

*Order allowing withdrawal of counsel and substitution of counsel entered on October 17, 2014.

** Justice Kite retired from judicial office effective August 3, 2015, and pursuant to Article 5, § 5 of the Wyoming Constitution and Wyo. Stat. Ann. § 5-1-106(f) (LexisNexis 2015) she was reassigned to act on this matter on August 4, 2015.

**NOTICE: This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.**

**HILL,** Justice.

[¶1]    Appellant Nathan Cook appeals a judgment awarding Appellee Amy Landerman $149,189.48 after the district court found Mr. Cook fraudulently obtained shares of Ms. Landerman's company, Northern Developmental Disability Service Providers, Inc., a Wyoming Corporation.

[¶2]    We will affirm the district court in all respects.

## ISSUES

[¶3]    Appellants present four issues for our review:

> 1.  Whether the trial judge erred as a matter of law in finding that Nathan Cook committed fraud and the fraud warranted an award of punitive damages?
> 2.  Whether the trial judge erred as a matter of law in disregarding the written contract of the parties?
> 3.  Whether the trial judge erred as a matter of law in ordering reformation of a written share purchase agreement?
> 4.  Whether the cumulative errors in the case constitute deprivation of the rights of the [Appellants] to a fair trial?

## STANDARD OF REVIEW

[¶4]    In general, we apply the following standard when reviewing a district court's decision after a bench trial:

> The factual findings of a judge are not entitled to the limited review afforded a jury verdict.  While the findings are presumptively correct, the appellate court may examine all of the properly admissible evidence in the record.  Due regard is given to the opportunity of the trial judge to assess the credibility of the witnesses, and our review does not entail re-weighing disputed evidence.  Findings of fact will not be set aside unless they are clearly erroneous.  A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.

*Moore v. Wolititch*, 2015 WY 11, ¶ 9, 341 P.3d 421, 423 (Wyo. 2015) (quoting *Miner v.*

*Jesse & Grace, LLC*, 2014 WY 17, ¶ 17, 317 P.3d 1124, 1131 (Wyo. 2014)).

[¶5]    With regard to the trial court's findings of fact,

> "we assume that the evidence of the prevailing party below is true and give that party every reasonable inference that can fairly and reasonably be drawn from it."

*Moore*, ¶ 10, 341 P.3d at 423 (quoting *Miner*, ¶ 17, 317 P.3d at 1131).

[¶6]    The district court's conclusions of law, however, are subject to our *de novo* standard of review. *Morris v. CMS Oil & Gas Co.*, 2010 WY 37, ¶ 12, 227 P.3d 325, 330 (Wyo. 2010), (quoting *Lieberman v. Mossbrook*, 2009 WY 65, ¶ 40, 208 P.3d 1296, 1308 (Wyo. 2009) (citations omitted)).

## FACTS

[¶7]    In November of 2010, Amy Landerman approached Nathan Cook about buying her business, Northern Developmental Disability Service Providers, Inc. (Northern). Mr. Cook expressed interest in buying the business. On January 24, 2011, Ms. Landerman e-mailed Mr. Cook and offered to sell Northern for $247,500. Mr. Cook indicated his interest in buying the business and the two agreed to meet at Northern's office on February 23, 2011.

[¶8]    At the February 23, 2011, meeting between Ms. Landerman and Mr. Cook, Mr. Cook's friend and "member of his financial team," Rich Hydo, was also present. At the beginning of the meeting, Mr. Cook said that he was comfortable with Ms. Landerman's sale price of $247,500, but had specific payment terms in mind. Mr. Cook proposed $175,000 down at closing, with the $72,500 balance of the purchase price to be paid in quarterly installments over three to five years. Ms. Landerman and Mr. Cook agreed to those terms and the remainder of the meeting was devoted to the parties' discussion about religion.

[¶9]    On March 23, 2011, Mr. Cook delivered a "soft agreement" to Ms. Landerman. The Agreement stated that Mr. Cook would pay $175,000 at closing with thirty-six months of installments of 3% profits, payable quarterly. Ms. Landerman responded to Mr. Cook in an e-mail that same evening. Ms. Landerman reiterated that the purchase price was $247,000.[1] She also reiterated that she would agree to a $175,000 down

---

[1]  Mr. Cook argues that the March 23rd e-mail shows a "conflict" with Ms. Landerman's earlier testimony, because she stated the purchase price was $247,000, rather than $247,500. Ms. Landerman testified that she inadvertently truncated the number: "I mean, it was seven o'clock at night, I worked all day, I had triplets running around, I was typing an e-mail." The district court found neither conflict, nor impeachment.

payment and the installments proposed by Mr. Cook, but if those installments did not total $72,000, a balloon payment would have to make up the difference at the end of three years.

[¶10] Mr. Cook responded by e-mail on March 28 and said he wanted a conference call "to get this finalized and then I can pass it along to my lawyer to work on the final contract." He did not dispute terms discussed in previous e-mails. At trial, Mr. Cook testified that he, Mr. Hydo, and Ms. Landerman had a conference call on March 29, 2011, where they all agreed to something different than the initial terms. The district court found Mr. Cook's testimony as to this particular conference call was not credible and "unbelievable."

[¶11] As Mr. Cook and Ms. Landerman had apparently agreed to the sale terms, other steps were being taken to finalize the business sale. On April 1, 2011, Ms. Landerman and Mr. Cook notified Northern's clients and their case managers that an agreement for the sale of the business had been made and would close by the end of the month. The notice was prepared together by Ms. Landerman and Mr. Cook. Ms. Landerman also notified the Commission on Accreditation of Rehabilitation Facilities (CARF), which approves the ownership change of associated facilities. Also, the State of Wyoming's Department of Health required transition meetings and final authorization of the ownership change. On April 29, Mr. Cook and Ms. Landerman both participated in a phone call with the supervisory State regulators at the Wyoming State Department of Health's Developmental Disabilities Division (DDD). In fact, the head of DDD requested that Ms. Landerman be excused from the Medicaid transfer discussion for confidentiality reasons, "if everybody is comfortable, this transfer is happening – you are set, it's going to be soon, any day." Mr. Cook assured everyone present that the transfer would take place, and Ms. Landerman was then dismissed from the meeting. A second letter was sent to all of Northern's clients on May 9, 2011 stating that Mr. Cook was purchasing Northern, and instructing clients to contact the DDD within 30 days of the closing, which the letter stated "We anticipate that the purchase will be on or before June 1, 2011." By the end of May, the transfer of the CARF accreditation and the Medicaid authority was complete, both of which had included Mr. Cook's full participation. Also by the end of May, Mr. Cook had the keys to Northern's building.

[¶12] While things seemed to be progressing, DDD expressed concern that there was ambiguity surrounding the actual date of change of ownership because certain regulations specified that transition interviews with clients had to be completed within 30 days of the transfer in ownership. Mr. Cook assured DDD that there was an agreement in place. Mr. Cook even indicated that there were technical paperwork hurdles at the bank that would be resolved, but in the meantime, he offered to give Ms. Landerman a $25,000 earnest money deposit. In fact, Mr. Cook paid that amount to Ms. Landerman within five business days.

[¶13] Mr. Cook testified at trial about the steps he took to secure financing from Wells Fargo Bank during May of 2011. He applied for financing at Wells Fargo, but did so listing Northern as the borrower, unbeknownst to Ms. Landerman, for the amount of $140,000. He testified at trial that he did so because he knew Wells Fargo would not lend him the full $175,000 closing payment. He therefore asked Ron Hill to be a guarantor/co-signor on his loan. However, Mr. Hill testified at trial that Mr. Cook told him the total purchase price was $175,000 *total*, not $247,000, and that Mr. Cook told him that Ms. Landerman had agreed to carry $45,000 of the total $175,000. Mr. Hill testified that he would not have agreed to guarantee the loan had he known the actual price was over $200,000. When preparing his loan application, Mr. Cook indicated to his accountant that the price was only $175,000, and he applied for a loan with Northern listed as the borrower, in the amount of $140,000.

[¶14] On the morning of June 8, 2011, Mr. Cook called Ms. Landerman to tell her that the loan was being closed that day. He indicated that he wanted her to sign their Agreement. Because Mr. Cook had applied for his loan under Northern's name, in order to close, the Bank required the transfer of stock, corporate resolutions and certifications, and signature card on Northern's accounts before the money would be loaned. The bank loan was for $131,000 to Northern, with a $10,000 line of credit to Mr. Cook's company, Positive Progressions.

[¶15] Mr. Cook went to Ms. Landerman's office and told her there was a problem with the loan and that "the bank did not lend me everything. I'm $44,000 short." Therefore, he would be unable to pay the $175,000 at closing. Ms. Landerman testified at trial that Mr. Cook pleaded with her to make a deal for the remaining $44,000. She agreed, with the understanding that Mr. Cook would come back later with an updated Agreement and that they would work out the payment details then. Mr. Cook then left Northern's office building. A witness outside the office building testified that she saw Mr. Cook come out of the building and go to his car and rummage around. The witness stated that Mr. Cook never left the parking lot but instead, he walked back into the building. No changes had been made to the Agreement.

[¶16] After Mr. Cook came back into the building, he and Ms. Landerman met again in her office. She testified that he was rushed and kept urging her to hurry. She attempted to read the first page of the contract but testified that Mr. Cook leaned in and put his hands between her and the document. According to Ms. Landerman, Mr. Cook said, "It's all there, everything we agreed to, just, you know, legal mumbo jumbo, you don't have to sit and read the whole thing because I have to go." Ms. Landerman then signed the Agreement without reading it. She did testify that the document had no attachments, nor was it dated. In direct opposition to Ms. Landerman's testimony, Mr. Cook testified that he never went to Northern on June 8. Rather, he testified that the Agreement was signed a full month earlier. The date, he said, was somewhere around May 6, 2011. The district

4

court made a number of findings that Mr. Cook was not being truthful when he testified to this.

[¶17]  At the end of the day on June 8, 2011, Mr. Cook paid Ms. Landerman $94,000. Instead of paying her $175,000 as agreed, he deducted $25,000 earnest money, $6,000 for a loan owed to Northern by an employee, $5,000 for "intent to purchase warranties" that required Ms. Landerman to reimburse any money recently paid to her from the corporation, and $10,000 as a temporary loan to cover cash flow shortfalls.  Regarding the $10,000 amount, Mr. Cook gave Ms. Landerman a post-dated check for $10,000 to be cashed on June 20, 2011.  However, Mr. Cook stopped payment on that check on June 9, 2011.  Along with the $25,000 earnest money payment, Ms. Landerman had only been paid a total of $119,000.

[¶18]  On September 22, 2011, Ms. Landerman filed a Complaint against Mr. Cook, his company Positive Progressions, and Northern.  The matter eventually went to trial and the district court entered judgment against Mr. Cook.  The district court found clear and convincing evidence that Mr. Cook committed fraud in the inducement and fraud in the execution.  The district court also found that an agreement existed between the parties, but that terms the parties agreed on were not reflected in the Agreement, in large part because of the fraud committed by Cook.  The court computed damages as the difference between the $247,000 promised by Mr. Cook and the $119,000 paid by him.  With prejudgment interest, the total damages equaled $149,189.48.  The district court also awarded punitive damages in the form of attorney fees and costs in the amount of $114,063.19.

[¶19]  Mr. Cook appealed both judgments separately, and this Court consolidated those appeals.

## DISCUSSION

*Fraudulent Inducement*

[¶20]  We first address Mr. Cook's argument that the district court's finding of fraud in the inducement should be reversed.  Mr. Cook argues for reversal because Ms. Landerman has "no tort damages, and because Landerman's testimony did not prove, by clear and convincing evidence, that Cook's conduct rose to the level of fraud."  We will address these in order.

A. Tort Damages (Economic Loss Rule)

[¶21]  Mr. Cook argues that because the entirety of Ms. Landerman's claimed damages arose out of the contract, and because there are no tort damages, the fraud count should be dismissed as a matter of law.  This raises questions under the economic loss rule.

Unfortunately for Mr. Cook, this issue is brought before this Court after no attempt to raise it below. Therefore, we will not consider it. "With the exception of certain jurisdictional or fundamental issues, we will not consider issues raised for the first time on appeal." *Meima v. Broemmel,* 2005 WY 87, ¶ 56, 117 P.3d 429, 447 (Wyo. 2005).

B. Sufficiency of the Evidence

[¶22] We next address whether there was sufficient evidence presented at trial such that the district court was able to find fraud in the inducement. The district court made numerous detailed findings regarding fraud in the inducement. They bear repeating here:

> 64. Prior to June 8, 2011, to induce Plaintiff to sign the Share Purchase Agreement, Defendant Cook represented and led Plaintiff to believe he would pay $247,000 total with $175,000 at closing and payments totaling $72,500 over three years.
>
> a. Defendant testified at trial that his intention was to pay only $125,000 for the company.
>
> b. On January 25, 2011, Plaintiff made a written offer to Defendant Cook to give him first option to buy the Company for $247,500.
>
> c. When the parties met on February 23, 2011, at Northern's offices, Defendant Cook simply asked for terms where he would pay $175,000 at closing and the balance over 3 to 5 years as a percentage of gross revenue. He further falsely represented that he had the resources to pay the $175,000 at closing.
>
> d. One month later, on March 23, 2011, Defendant Cook met with Plaintiff at Northern and delivered Exhibit 46 which proposed an offer for payment of $175,000 at closing plus 3 percent net over three years.
>
> e. Plaintiff immediately responded to Exhibit 46, with Exhibit 45 also see Exhibit 60, an email exchange that stated she must have $247,000 and that payments after closing had to total $72,000 over three years. This Court determines that these are the terms of the agreement reached between the parties and relied on by Plaintiff ($247,000.00 not $247,500.00).

6

f. Defendant emailed Exhibit 61 indicating his desire to meet and finalize the agreement so his lawyer could work on the final agreement. Defendant Cook did not mention, let alone reject or otherwise contradict Plaintiff's statement as to the purchase price or the payment terms set forth in her Exhibit 45 email.

g. Instead, Defendant made representations that "we have a deal." These included representations on April 29, 2011, in front of Plaintiff to regulators from the State of Wyoming's Department of Health, Division of Developmental Disability that "we have a deal" and reassuring the department[']s officials as well as Plaintiff that he was only waiting for the bank to finish processing the financing and for his lawyer to finish the formal contract documents. These statements made to Plaintiff and in her presence affirmed Defendant Cook's agreement to Plaintiff's share purchase terms of $175,000 down at closing and $72,000 paid over 3 to 5 years.

h. At no point thereafter did Defendant Cook disclose to Plaintiff that he was preparing the Agreement with different terms. Instead, he presented the Agreement to her on June 8 with the representation that it has "everything you wanted."

65. Defendant Cook's representations to Plaintiff about paying the $247,500 purchase price and the $175,000 at closing were false; he never intended to pay either sum.

In April and May leading up to the June 8, 2011 execution and closing of the Agreement, Defendant Cook told Mr. Hill, Mr. Whittle and the Bank that the purchase price was only $175,000.

a. Defendant Cook's notes of a conversation between him and the Bank (Exhibit 66) reflect him telling the Bank the total purchase price would be $175,00.00 and being told by the Bank that it would require him to contribute 25% of the purchase price and have a guarantor.

b. Defendant Cook solicited Ron Hill to be his guarantor and, before Mr. Hill filled out the necessary Bank papers

7

on April 25, Cook told him that the total price would be $175,000 with Plaintiff agreeing to carry $45,000 of the $175,000 over three years.

c.  On or about May 4, 2011, Defendant Cook spoke with his accounting firm of Whittle, Ostler, Hamilton and Associates.  According to notes by Dave Whittle, a principal in the firm, Defendant Cook told him that the purchase price would be $175,000. (Exhibit 97)

d.  Accordingly, Defendant Cook never had any intention of paying Plaintiff's purchase price of $247,500 despite his representations to Plaintiff he would in the February 23 meeting and reaffirmed in the March 23 discussion and the follow-up e-mails, followed by the representations to Plaintiff and State officials about having a deal with Plaintiff.

e.  Defendant Cook's false representations to the aforementioned third parties about the purchase price further support his propensity to make repeated false and fraudulent representations to secure his objective loans, guarantees and business purchase.

66. The loan application submitted for $140,000 by Defendant Cook to Wells Fargo Bank on May 6, 2011, combined with his statements to Ron Hill and Dave Whittle, shows that Defendant Cook never intended to pay the $175,000 closing payment that is specified in the agreement.

67.  Defendant Cook intentionally misrepresented what Wells Fargo was doing on the morning of June 8 in order to get plaintiff to transfer the stock of Northern to him without his having to pay the contractual $175,000 payment at closing, Defendant told Plaintiff that the Bank unexpectedly shorted his loan by $44,000.

68. Defendant Cook created the appearance of a mere short term unexpected glitch by personally reassuring plaintiff, saying "you know I am good for it."  These statements were made to Plaintiff to get her to sign over the shares of stock without receiving the $175,000 due at closing.

8

69. Defendant Cook's representation of a sudden and unexpected emergency was patently false as was the representation that the Bank loan was short $44,000. (Exhibit 28, Resp. to Interrogatory 9.)

a. Defendant Cook testified that his initial conversations with the Bank about the loan were about obtaining conventional financing of $140,000 or SBA financing of $149,000 at a higher rate. He thus knew from the outset that he was not getting financing of $175,000.

b. Defendant Cook's loan application, submitted on May 6, 2011, was for only $140,000. He knew for more than two months before closing on June 8, 2011, that the Bank loan would be less than the contractually promised $175,000 closing payment.

c. Until the May 27, 2011 notice from Wyoming Department of Developmental Disabilities' Linda Hallock, Defendant Cook did nothing to cover the difference between the $140,000 loan application and the $175,000 required at closing. However, when it appeared that the transaction might derail, he quickly found another $25,000 to give Plaintiff an earnest money deposit.

d. Defendant Cook's testimony was that on June 8, 2011, the Bank informed him for the first time that it was only loaning $131,000 to Northern. (exhibit 8) He said he was shocked to learn of the Bank's decision to short him $44,000. Mr. Hill testified that Defendant Cook acted shocked to learn that the loan was only going to be $131,000. Defendant Cook's further testimony, however, was that the Bank extended an additional $10,000 line of credit of his company, Positive Progressions, LLC, totaling $141,000. The combined loans were $1,000 more than had been requested in Defendant Cook's loan application. Therefore, the Bank did not short him or Northern $44,000 on June 8. In fact, the loans were in excess of the application and not short at all.

e. For defendant Cook to represent to Plaintiff that the Bank had shorted his loan by $44,000 in order for him to get her

9

to transfer the stock to Northern without having to pay the $175,000 was knowingly fraudulent.

f.  Adding the $25,000 earnest money advanced by Positive Progressions on June 3 and the $141,000 loaned by the Bank on June 8 totals $166,000 which is only $9,000 "short" of the $175,000 on June 8th, not the $44,000 that Defendant Cook represented to Plaintiff.

g.  Rather than a shocking new revelation that he would be $44,000 short occurring for the first time on June 8, 2011, Defendant Cook had known from prior to his May 6, 2011 loan application that without additional funding, he was going to be short sufficient funds to pay the $175,000. He knew from Exhibit 66 that his conventional loan would only produce $131,000 in loan proceeds regardless of the amount of his application. Thus, he knew prior to his May 6, 2011 loan application that the loan approval would be $44,000 short of the $175,000 down payment due at the time of closing.

h.  Defendant Cook's statement to plaintiff that "you know I am good for it" to induce her to give him leniency or accommodation to pay the $44,000 he claimed he was short was a false representation at the time it was made was fraudulent.

70.  Defendant Cook's subsequent conduct shows that he had no intention of paying the $44,000 he led Plaintiff to believe that he was short. Exhibit 76 shows that Defendant's first transactions in Northern's bank accounts after closing were to remove $22,532 as reimbursement to himself and his father-in-law for money paid to Plaintiff by Positive Progressions, and spend on acquiring Northern's shares. Defendant Cook wrote checks from Northern's account to his wife Hillary in the sum of $7,532.40 (rather than to positive Progressions, LLC, the source of the down payment monies) and to his father-in-law Merrill Hutchenson in the sum of $25,000.00 (rather than to Positive progressions LLC, the source of the down payment monies) on June 17, 2011. That Exhibit shows that he had adequate funds in Northern's account to pay the $9,000 he was short on the purchase price plus the $10,000 Plaintiff loaned Northern, yet he chose to pay

10

himself and his father-in-law rather than Plaintiff. This is also an example of the alter ego commingling of funds within the two entities Positive Progressions LLC, Northern and Defendant Cook and/or Hillary Cook. It is clear to this Court that Nathan Cook, Positive Progressions LLC and Northern are all the same under the control of and used by Defendant Cook as he wishes without regard to the entity formalities or status required of LLCs or Corporations

71. Defendant Cook admitted to adding the date of execution at some undefined time after the date of execution. There was at least one indication that at least one page of the Agreement may have bee substituted after the time the Agreement was signed by Plaintiff. For example, on page 3, the end of Paragraph 4.1e ends in an incomplete sentence which is not continued on page 4 of Exhibit 1 and Exhibit 1a. No evidence was produced by Defendant Cook or the other entities explaining that abrupt ending which page also happens to include Defendant's claimed contract warranties that he used as a basis of withholding the monies from Plaintiff. None of the pages of the Agreement were initialed by either party.

72. Defendant Cook gave testimony and his counsel argued that at the time when the Agreement was signed on June 8, 2011 he believed Plaintiff was in breach of the Agreement, that he would not be bound by it. The inference is that Defendant Cook had no intention of performing his and/or the other Defendants' obligations under the Agreement when he signed it on June 8, 2011.

73. Defendant Cook testified he had not read the Agreement that he had Plaintiff sign.

74. Defendant Cook testified that he had his lawyer draft the Agreement so that Plaintiff would be locked in.

75. At the afternoon's informal closing (after Plaintiff signed the Agreement) at Northern's offices on June 8, 2011, Defendant Cook represented to Plaintiff that the Agreement prohibited her from paying for personal expenses out of the business accounts prior to the signing of the Agreement. He told her that she had to reimburse the company for such

11

expenses. With that false statement, he extracted her admission of having taken distributions of $5,000 for pre-agreement personal spending (distributions) out of the company. He represented to her that the Agreement (which he was withholding from her) therefore required her to pay that money to Northern for him.

76. Defendant Cook also falsely represented to Plaintiff that she had failed to disclose a loan to Nabu Livingston and that the Agreement's warranties required her to pay that amount personally. Again without providing her with a copy of the Agreement, he represented to her that he was deducting the $6,000 loan from the amount of money owed to Plaintiff at the closing.

77. The Livingston Loan had been disclosed to Defendant Cook in April (Exhibit 4) and he elected to close without requiring any disclosures be attached to the Agreement.

78. Defendant Cook asked plaintiff to meet with him at Northern on July 20, 2011 to discuss the situation. Exhibit 76 shows that he deposited $10,000 to Northern's account on July 19 the day before the meeting. He removed it after he stalled Plaintiff's attempts to get paid (exhibit 76) and then cancelled the June 20 check. (Exhibit 18)

[¶23] With the court's findings in mind, we turn to whether they are supported by the evidentiary record such that the district court could conclude that Mr. Cook committed fraud in the inducement. A plaintiff alleging fraudulent inducement carries the burden of showing by clear and convincing evidence that

1) the defendant made a false representation intending to induce action by the plaintiff;
2) the plaintiff reasonably believed the representation to be true; and
3) the plaintiff suffered damages in relying on the false representation.

*Claman v. Popp*, 2012 WY 92, ¶ 43, 279 P.3d 1003, 1016 (Wyo. 2012) (quoting *Bitker v. First Nat'l Bank*, 2004 WY 114, ¶ 12, 98 P.3d 853, 856 (Wyo. 2004)). "Clear and convincing evidence is the 'kind of proof which would persuade a trier of fact that the truth of the contention is highly probable.'" *Alexander v. Meduna*, 2002 WY 83, ¶ 29, 47

12

P.3d 206, 216 (Wyo. 2002) (quoting *MacGuire v. Harriscope Broadcasting Co.*, 612 P.2d 830, 839 (Wyo. 1980)).

[¶24] We note that Mr.. Cook's arguments on appeal rely for the most part on a rehashing of the testimony and exhibits given and presented at trial, without citing too much authority at all. We will not reweigh testimony on appeal. *FFJ v. ST*, 2015 WY 69, ¶ 14, 348 P.3d 415, 420 (Wyo. 2015). "This Court ... does not reweigh evidence. Instead, we view the facts in the light most favorable to the prevailing party." *Id.* (citing *Hayzlett v. Hayzlett*, 2007 WY 147, ¶ 8, 167 P.3d. 639, 642 (Wyo. 2007)).

[¶25] Our review of the record persuades us that it contains more than sufficient evidence to support the district court's determination that Mr. Cook committed fraud in the inducement. Mr. Cook testified at trial that he only intended to pay $125,000 for the business. Yet, e-mails exchanged between Ms. Landerman and Mr. Cook show an agreed upon purchase price of $247,500. Subsequent behavior by Cook establishes that his intent was never to pay. Mr. Cook's misrepresentations were numerous, including his false statements to Ms. Landerman, Wells Fargo Bank, his guarantor Mr. Hill, and beyond.

[¶26] Also supporting Mr. Cook's fraudulent inducement of Ms. Landerman is the parties' often opposing testimony given at trial. The district court addressed those discrepancies with credibility determinations. The district court was in the best position to make those determinations, and we defer to its determinations. *Walter v. Walter*, 2015 WY 53, ¶ 12, 346 P.3d 961, 966 (Wyo. 2015) ("We have often said that the credibility of witnesses is for determination by the trial court."). Given the testimony and evidence presented at trial, we have no reason to question the district court's credibility determination and subsequent evidentiary ruling. Conflicts in testimony are to be resolved by the trier of fact. *Forshee v. Delaney*, 2005 WY 103, ¶ 12, 118 P.3d 445, 449 (Wyo. 2005). Here, the district court resolved the conflict in favor of Ms. Landerman. Such resolution was particularly justifiable in light of the district court's finding that Mr. Cook made numerous contradictory statements and that he was "extremely vague," "contradictory," "non-responsive," "evasive" and "misleading." Mr. Cook's refusal to produce cell phone records also contributed to the court's findings. The district court noted that Mr. Cook "came up with a new version of facts indicating that the Agreement was signed at some time prior to June 8, 2011," which the court found to be "not credible." In fact, rather than simply excluding Mr. Cook's testimony, the district court specifically found it to be "not credible."

[¶27] We conclude that there was more than sufficient evidence for the district court to find fraud in the inducement.

*Punitive Damages/Attorney's Fees*

[¶28] Mr. Cook argues next that punitive damages should be reversed because his conduct "does not rise to the level of conduct required to support a punitive damages award."

[¶29] Wyoming law abides by the American rule, providing that each party is responsible for his or her own attorney fees. *Thorkildsen v. Belden*, 2012 WY 8, ¶ 10, 269 P.3d 421, 424 (Wyo. 2012). Attorney fees are recoverable under the American rule only where a contractual or statutory provision authorizes such recovery, or as a form of punitive damages when such damages can properly be awarded. *Alexander*, ¶ 49, 47 P.3d 220-21; *see also Olds v. Hosford*, 354 P.2d 947, 950 (Wyo. 1960) (recognizing an exception to the general rule denying recovery of attorney fees and costs in a replevin action where "fraud, malice, oppression or willful wrong" can be shown). To determine the reasonableness of the attorney's fees award, Wyoming employs the two-factor federal lodestar test. These factors are: "(1) whether the fee charged represents the product of reasonable hours times a reasonable rate; and (2) whether other factors of discretionary application should be considered to adjust the fee either upward or downward." *Alexander*, ¶ 49, 47 P.3d 220-21. The trial court's determination concerning attorney's fees is reviewed under an abuse of discretion standard. *Id.*

[¶30] The district court awarded Ms. Landerman punitive damages in the amount of $114,063.19 "representing an award of attorney fees of $111,029.25 and litigation expenses and costs totaling $3,033.94." In arriving at its decision, the district court elaborated on the seven factors originally enunciated by this Court in *Farmers Ins. Exch. v. Shirley*, 958 P.2d 1040 (Wyo. 1998). *Alexander*, ¶ 42, 47 P.3d 220. There, this Court applied factors approved by the United States Supreme Court in *BMW of N. Am. v. Gore,* 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996).

[¶31] What follows are the *Shirley* factors and the district court's application of them to the evidence in this case:

> a. *Reasonable relationship to harm inflicted:* Plaintiff pointed to the findings in the judgment as demonstrating that Defendants inflicted severe and direct financial harm on the Plaintiff in the amount of $149,189.48 in damages. [ … ]. The Affidavit of Landerman further described serious, oppressive, harsh, emotional and financial impacts that resulted for Plaintiff and her three young children from Defendant Cook's misconduct.

14

b. *Reprehensibility and cover*-up: Plaintiff contended that the findings in the Judgment already document [the] extent of this factor with findings of multiple willful misrepresentations of material facts as well as outright falsehoods. Among other things, Plaintiff pointed to the Court's findings that Defendant Cook traded on his and Plaintiff's religious faiths [ … ] and to the Judgment's four pages of findings on false and misleading statements by Defendant Cook in testimony [ … ]. The Affidavit of Simonton also was submitted as support for Plaintiff's contentions about Defendant's litigation tactics, apparent concealment of evidence, misrepresentations of fact in discovery and testimony, and the frequency of such conduct.

c. *Regarding the factor of whether the wrongful conduct was profitable to the defendant:* Plaintiff contended that findings of fact in the Judgment and evidence admitted at trial showed that Defendant was attempting to pay a mere fraction of what he had promised to pay and that his wealth had increased greatly since defrauding Plaintiff into transferring her stock in Northern DDSP to him on June 8, 2011. Pointing to the record and the affidavits before the Court, Plaintiff contended that Defendant Cook's misconduct extended for two and one half years. She contended Defendant Cook reaped the business benefits of having Plaintiff's business while not paying what was owed. Plaintiff contended that the record and submissions showed that Defendant engaged in an extensive attempted cover-up, including willfully concealing evidence, deliberately misleading discovering responses, misrepresentations to the Court, and giving testimony at trial that was patently false. [ … ] Plaintiff pointed to the Defendant's tax returns and acquisition of other properties and businesses while withholdings funds owed to Plaintiff as well as the matters in the judgment. Plaintiff also supplemented with additional documents consisting of a financial statement and attachments [ … ] subpoenaed from Big Horn Federal Savings Bank with regard to a June 12, 2014 loan granted to Defendant. Plaintiff argued that Exhibit 20 showed that Defendant had managed to leverage a very large increase in his net worth to $2.4 million, up considerably from the net worth claimed by him in an April

2011 financial statement that he submitted to Wells Fargo Bank […]. Plaintiff further contended that Exhibit 20 demonstrated that Defendant Cook was representing to Big Horn Federal Savings Bank that without any appreciable increase in Northern DDSP's revenues, the stock he acquired from Plaintiff should be valued at $420,000. That is nearly twice what the Judgment found Defendant Cook had agreed to pay Plaintiff. It was three and a half times the amount he was found to have actually delivered to her. Plaintiff contended that the amount of punitive damages sought as attorney fees was only a fraction of the gains Defendant Cook obtained through his fraud and that the award of all attorney fees would not come close to removing all of the Defendants' profit in the transaction.

d. *With regard to the factor of Defendant's financial position:* Plaintiff pointed to the admitted trial exhibits of Defendants' income tax returns and filings and their financial statements through 2012. Plaintiff also submitted Defendant Cook's 2013 Federal income tax return and his June 2014 financial statement showing him currently having a net worth of $2.4 million [ … ].

e. *With regard to the factor that "all the costs of litigation should be included, so as to encourage Plaintiffs to bring wrongdoers to trial".* Plaintiff contended that her submissions on her attorney fees and costs satisfied this requirement.

f. *With regard to whether Defendant has been subjected to criminal sanctions that would mitigate punitive damages:* […] no criminal sanctions mitigate the matters covered by this Judgment.

g. *With regard to other civil actions against Defendant for the same conduct:* Plaintiff demonstrated that there were none.

[¶32]   With our standard of review in mind, we conclude that the district court's award of punitive damages in the form of attorney fees and costs was proper and absolutely within its discretion. The district court's findings are quite detailed, and the record contains ample evidence supporting the district court's discussion of the seven factors set forth by this Court to allow an award of attorney's fees as punitive damages. The district court did not abuse its discretion in awarding punitive damages.

16

*The Contract*

[¶33]  Mr. Cook argues next that there was a contract and that it was unambiguous and controlling.  We agree but come to our conclusion in a dissimilar way than Mr. Cook.

[¶34]  The district court said the following about the contract:

> 2. As more specifically outlined in the findings of fact, this Court concludes that a contract was entered into for the sale of Plaintiff's shares in Northern considering the e-mails in Exhibits 45, 46, and 60, the representations that Defendant Cook made state regulators that they, Plaintiff and he had an agreement and the representation that "everything she wanted" was in the Agreement.  The evidence in this case, as described in the findings of fact, clearly shows there was an offer, acceptance, and consideration and that the Parties intended to enter into a contract.

[¶35]  We agree that the district court found a contract existed.  However, instead of the written Share Purchase Agreement, the district court's findings of facts further explain what it found to be the parties' Agreement:

> 53. The basic terms of the Agreement [ … ] provide for payment terms of $175,000.00 to be paid at closing by Defendants, with three (3) annual payments on the anniversary dates of the signing of the Agreement in the amount of 3% of net income of Northern or $15,000.00 whichever is greater.  This would net Plaintiff $220,000.00, not the $247,000.00 that she last communicated to Defendants she required for the purchase of her business.  Although Plaintiff did not read the Agreement required for the purchase of her business.  Although Plaintiff did not read the Agreement as put in front of her on June 8, 2011 the circumstances are such that the Court believes she had reason to and did rely on the representations of this ethical and responsible businessman.  The Court concludes that there was a meeting of the minds as to the payment terms.  They are the terms last communicated by Plaintiff to Defendant Cook on March 23, 2011 as shown in Exhibit 45 and 60.  That is what Plaintiff believed when Defendant Cook said on June 8, 2011, that the Agreement has "everything you wanted."  She relied on that.  In reliance on that she turned the office over to

17

Defendant Cook, gave him her keys, passwords, and the proprietary documents, manuals, and other papers necessary to maintain certification.

54. There was no meeting of the minds as to Defendant Cook and Plaintiff over any warranty provisions, exhibits or other terms.

Stated another way, the district court found an oral agreement between the parties.

[¶36] Despite the district court's clear ruling, Mr. Cook asserts that it "rewrote the purchase price term of the written contract" and effected a reformation of the contract. Mr. Cook misinterprets the district court's ruling. The district court indicates in its findings that there was a contract, and the district court found a meeting of the minds through various communications between the parties. However, the contract that existed is not represented by the agreement, because of the fraudulent behavior by Cook. It is clear from the district court's judgment that it did not consider the agreement as the contract – rather, the parties did contract, but through prior communications.

[¶37] We turn to whether the district court's finding that a contract, in the form of an oral agreement, existed is supported by the record. The district court stated in its Conclusions of Law:

2. As more specifically outlined in the findings of fact, this Court concludes that a contract was entered into for the sale of Plaintiff's shares in Northern considering the e-mails in Exhibits 45, 46, and 60, the representations that Defendant Cook made [to] state regulators that they, Plaintiff and he had an agreement and the representation that "everything she wanted" was in the Agreement. The evidence in this case, as described in the findings of fact, clearly shows there was an offer, acceptance, and consideration, and that the Parities intended to enter into a contract.

[¶38] Our case law identifies the requisites of a contract.

"An offer, acceptance, and consideration are the basic elements of a contract." *Bouwens v. Centrilift*, 974 P.2d 941, 946 (Wyo.1999) (quoting *Miller v. Miller*, 664 P.2d 39, 40 (Wyo.1983)). There must be mutual assent to the same terms. *Bouwens*, 974 P.2d at 946. The contracting process is usually straightforward. One party makes a manifestation of assent, called an offer, to another; the latter then makes a

18

manifestation of assent, called an acceptance, to the former. *Id.* "Whether an oral contract exists, the terms and conditions of the oral contract and the intent of the parties are generally questions of fact." *Wilder v. Cody Country Chamber of Commerce*, 868 P.2d 211, 218 (Wyo.1994). Only when the offer, the terms of the offer, and the unconditional acceptance of the offer are shown without any conflict in the evidence does the interpretation of the contract become a question of law for the court. *Id.; Engle v. First Nat'l Bank of Chugwater*, 590 P.2d 826, 830 (Wyo.1979).

*Roussalis v. Wyoming Med. Ctr., Inc.,* 4 P.3d 209, 249-50 (Wyo. 2000). "An agreement to make a written contract where the terms are mutually understood and agreed on in all respects is as binding as the written contract would be if it had been executed." *Robert W. Anderson Housewrecking & Excavating v. Board of Trustees*, 681 P.2d 1326, 1331 (1984).

[¶39] We agree with the district court that an oral contract existed in this case. At the parties' initial meeting on February 23, 2011, Mr. Cook stated to Ms. Landerman that he had the resources to pay $247,500, with $175,000 at closing. Ms. Landerman clarified the payment terms in an e-mail to Mr. Cook on March 25, 2011. Mr. Cook replied to the e-mail without disputing or objecting to the price. Following this e-mail, Mr. Cook participated in announcing the transfer in ownership, including assuring state regulatory officials of his intent to purchase Northern. He assured the regulatory officials that the parties made a deal, and even paid Ms. Landerman $25,000 in earnest money prior to closing, further demonstrating the existence of an oral contract. The evidence proved that the parties established an agreed upon price. In reliance on Mr. Cook's ensuing actions and statements, there was a meeting of the minds as to the terms of the Agreement. Through Mr. Cook's e-mails and responses back to Ms. Landerman, the "deal" proceeded and Mr. Cook obtained financing. Both parties indicated to proper state agencies that Mr. Cook was buying the business. This evidence was sufficient to establish all of the requisite elements of a contract—offer, acceptance, and consideration.

[¶40] We have expressed on many occasions that public policy does not favor the forfeiture of contract rights. (*See Wyoming Realty Co. v. Cook*, 872 P.2d 551, 554 (Wyo. 1994); *Gray v. Stratton Real Estate*, 2001 WY 125, ¶¶ 9-10, 36 P.3d 1127 (Wyo.2001)). Because we are especially conscious of parties' freedom to contract, we do not disregard the written contract lightly. Here, we do so only because Mr. Cook fraudulently induced Ms. Landerman to sign the document. We are of the same opinion as the Supreme Court of Idaho:

While normally the terms of a written contract will control, Idaho law firmly allows that "[f]raud in

19

the inducement is always admissible to show that representations by one party were a material part of the bargain." "[A]greements and communications prior to or contemporaneous with the adoption of a writing are admissible in evidence to establish fraud." Fraud vitiates the specific terms of the agreement and can provide a basis for demonstrating that the parties agreed to something apart from or in addition to the written documents.

*Aspiazu v. Mortimer*, 139 Idaho 548, 82 P.3d 830, 833 (Idaho 2003) (internal citations omitted). Mr. Cook committed fraudulent inducement by pressuring Ms. Landerman to sign the contract while preventing her from reading it. We choose to disregard the written document in this instance because fraud was clearly present.

[¶41] As a peripheral argument, Mr. Cook suggests that reformation of the contract took place. However, Mr. Cook's argument misunderstands the application of reformation and its root meaning. Reformation is an equitable remedy available in cases where a mistake in the drafting of the written contract makes the writing convey the intent or meaning of neither party to the contract. For reformation to be available there must be clear and convincing evidence of the following elements: (1) a meeting of the minds—a mutual understanding between the parties—prior to the time a writing is entered into, (2) a written contract, or agreement, or deed (3) which does not conform to the understanding, by reason of **mutual mistake**. *Ohio Cas. Ins. Co. v. W.N. McMurry Constr. Co*., 2010 WY 57, ¶ 15, 230 P.3d 312, 320 (Wyo. 2010). There was no mutual mistake in this instance. The foregoing discussion bears that out in full.

## *Cumulative Error*

[¶42] In his last issue, Mr. Cook claims cumulative error. He argues that "a review of the case shows that there are various errors which, when viewed cumulatively with the other previous points in this brief, prejudiced the Defendants and deprived them of a fair trial." In describing the errors, Mr. Cook states, "…the trial was a never ending series of leading questions from Ms. Landerman's lawyer. The witnesses were not properly questioned and the evidence was not properly adduced. The judgment specifically quotes a variety of statements from the testimony, most of which would have been the lawyer's statements[.]" Mr. Cook also lists the following as error: striking of affirmative defenses, incorrect application of the law as to the motion to withdraw the response to admissions, participation of the judge in the proceedings, incorrect application of the presumption regarding missing witnesses, evidence regarding the loan application and Mr. Cook's financing efforts should not have been admitted, and incorrect law was applied regarding interest and cost award.

20

[¶43] About cumulative error we have said,

> "The purpose of evaluating for cumulative error is 'to address whether the cumulative effect of two or more individually harmless errors has the potential to prejudice the defendant to the same extent as a single reversible error.'" *Guy v. State*, 2008 WY 56, ¶ 45, 184 P.3d 687, 701 (Wyo.2008) (citations omitted). Only those matters that are considered error are evaluated under our cumulative error analysis. *Id*. "We will reverse . . . only when 'the accumulated effect [of the errors] constitutes prejudice and the conduct of the trial is other than fair and impartial.'" *Id*. (citations omitted).

*SAS v. Dep't of Family Servs. (In re AGS)*, 2014 WY 143, ¶ 32 , 337 P. 3d 470, 480 (Wyo. 2014).

[¶44] We wholly reject Mr. Cook's argument. Again, we typically do not address issues raised for the first time on appeal, unless they are fundamental or jurisdictional in nature. *See, e.g., Anderson v. Bd. of County Comm'rs*, 2009 WY 122, ¶ 15, 217 P.3d 401, 405 (Wyo. 2009). Furthermore, Mr. Cook provides no cogent argument or citation of pertinent authority to support his claims on appeal. *J & T Properties, LLC v. Gallagher (In re Establishment of a Private Roadway to Real Prop.)*, 2011 WY 112, ¶ 23, 256 P.3d 522, 527 (Wyo. 2011).

*W.R.A.P. 10.05 Motion by Appellees*

[¶45] On June 1, 2015, Ms. Landerman filed a "*Motion and Memorandum for Certification of There Being No Reasonable Grounds for Appeal and for Award of Fees and Costs under W.R.A.P. 10.05.*" She argues that there was no reasonable cause for this appeal and asks this Court to award fees and costs pursuant to W.R.A.P. 10.05 and deem this appeal frivolous. She argues that Mr. Cook violated the Wyoming Rules of Appellate procedure in a myriad of ways, including lack of cogent argument and lack of citation to pertinent authority and that many of Cook's issues are raised for the first time on appeal.

[¶46] We have said

> that this Court typically does not impose sanctions when an appeal challenges a district court's discretionary ruling. *Montoya v. Navarette-Montoya*, 2005 WY 161, ¶ 9, 125 P.3d 265, 269 (Wyo.2005); *Russell v. Russell*, 948 P.2d 1351, 1356 (Wyo.1997). It is true that, under rare

circumstances, this Court will award sanctions, but only when the appeal is so lacking in merit it results in an obvious waste of judicial resources, or when rule violations are particularly egregious. *See, e.g., Osborn v. Kilts*, 2006 WY 142, ¶ 16, 145 P.3d 1264, 1268 (Wyo.2006); ☐*Montoya*, ¶ 9, 125 P.3d at 269; ☐*Welch v. Welch*, 2003 WY 168, ¶ 13, 81 P.3d 937, 940 (Wyo.2003).

*Pond v. Pond*, 2009 WY 134, ¶ 15, 218 P.3d 650, 653-654 (Wyo. 2009).

[¶47]  While there are clear issues with Mr. Cook's brief, his arguments therein, and his compliance with the rules, we nevertheless deny Ms. Landerman's motion.  We are not persuaded that the appeal was altogether frivolous or so egregious as to merit sanctions.

## CONCLUSION

[¶48]  We affirm the district court.