# IN THE SUPREME COURT, STATE OF WYOMING

## 2016 WY 34

OCTOBER TERM, A.D. 2015

*March 11, 2016*

PENNACO ENERGY, INC.,

**Appellant**
**(Defendant),**

**v.**

BRETT L. SORENSON, Trustee of the
Brett L. Sorenson Trust dated
November 2, 2011,

**Appellee**
**(Plaintiff).**

S-15-0210

*Appeal from the District Court of Sheridan County*
*The Honorable William J. Edelman, Judge*

*Representing Appellant:*
> Marie R. Yeates and Michael A. Heidler of Vinson & Elkins, L.L.P., Houston, Texas; Mark R. Ruppert, Isaac N. Sutphin, and Jeffrey S. Pope of Holland & Hart, LLP, Cheyenne, Wyoming; Patrick H. Martin, Professor of Law, Louisiana State University. Argument by Ms. Yeates.

*Representing Appellee:*
> Kendal R. Hoopes of Yonkee & Toner, LLP, Sheridan, Wyoming

*Before BURKE, C.J., and HILL, DAVIS, FOX, and KAUTZ, JJ.*

**NOTICE: This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.**

**DAVIS**, Justice.

[¶1]    This case arises from Pennaco Energy Inc.'s refusal to perform obligations under a surface damage and use agreement.  The story began some years back when Pennaco acquired mineral leases beneath a surface estate owned by Brett Sorenson, Trustee of the Brett L. Sorenson Trust.  The parties negotiated a contract concerning damage to and use of the surface estate.  It granted Pennaco access to and use of the land during exploration for and production of minerals it had leased.  In return, Pennaco agreed to pay for damage to and use of the surface estate, and to reclaim the land once operations ended.

[¶2]    With the surface damage and use agreement in place, Pennaco began drilling and production operations on Sorenson's land.  It continued operations and made the requisite payments to Sorenson for a number of years, but then decided to sell its oil and gas interest to CEP-M Purchase, LLC.  As part of the sale, Pennaco assigned its interest in the operations and agreements to CEP-M, which reassigned those interests to another company, High Plains Gas, Inc.  Since then, neither Pennaco nor the assignees have made any of the payments required by the surface damage and use agreement and have not reclaimed Sorenson's land.

[¶3]    Sorenson brought this lawsuit against Pennaco, CEP-M and High Plains Gas to recover the unpaid surface damage and use payments, and for damages resulting from the failure to reclaim lands and repair water wells.  CEP-M and High Plains Gas defaulted.  Pennaco answered and unsuccessfully moved for summary judgment, after which the case made its way to a jury trial.  The jury rendered a verdict finding that Sorenson suffered $1,055,982.62 in damages.  The district court entered judgment on the jury's verdict, and also awarded Sorenson costs and attorney fees, as provided for in the contract, in the amount of $332,662.97.

[¶4]    Pennaco contends on appeal that the district court erred by (1) ruling as a matter of law that Pennaco remained liable under the surface damage and use agreement after assignment, and (2) using a 2.5 multiplier to enhance the lodestar amount in awarding attorney fees.  As to the first issue, the parties in this case submitted their briefs without having the benefit of our recent decision in *Pennaco Energy, Inc. v. KD Co. LLC*, 2015 WY 152, 363 P.3d 18 (Wyo. 2015).  That precedent controls the first issue, and we conclude the district court did not err in ruling that Pennaco remains liable under the surface damage and use agreement.  As to the second issue, the district court did not abuse its discretion in awarding attorney fees to Sorenson as it did.  Accordingly, we affirm.

## ISSUES

[¶5]    1. Did the district court err when it determined as a matter of law that Pennaco remains liable to perform obligations under the surface damage and use agreement, where

1

those obligations purportedly accrued after Pennaco assigned its interest in the mineral estate and the surface damage and use agreement to a third party?

2. Did the district court abuse its discretion by adjusting Sorenson's attorney fees award upward 2.5 times from an amount calculated by multiplying the number of hours by the hourly rate?

## FACTS

[¶6] Sorenson owns a ranch along the Powder River near the town of Arvada, Wyoming. The ranch land is a split estate for mineral development purposes; that is, the surface estate is owned by Sorenson and the mineral estate is owned by several parties. Specifically, the minerals are owned in part by seven private parties, the State of Wyoming and Sorenson. The third party mineral owners, including the State of Wyoming, executed oil and gas leases underlying the surface estate. Subsequently, so did Sorenson.[1]

[¶7] In the 1990s, Pennaco acquired interests in the oil and gas leases underlying Sorenson's ranch. Pennaco and Sorenson then entered into a surface damage and use agreement, the stated purpose of which was to give the parties a "firm understanding as to what damages will be payable in the event of development of the lands" owned by Sorenson. The contract gave Pennaco the right to enter upon and use Sorenson's lands for the purpose of coalbed methane drilling and production operations. The access and use rights granted to Pennaco were separate from and in addition to the basic reasonable use of the surface that Pennaco had as a mineral owner under the oil and gas leases.[2] As a result, Pennaco had the benefit of detailed terms upon which it could construct access roads, put up power lines, and install pipelines on Sorenson's property.

[¶8] In exchange for the rights it was granted by the surface damage and use agreement, Pennaco agreed to make annual payments to compensate Sorenson for the use of his land and the damages caused by its operations. The agreement required annual payments of $750.00 for each well drilled and $5.00 per rod[3] for the access roads and pipelines constructed. The contract provided that "[a]ll annual payments are due and payable until such time as the property is restored and reclaimed."

---

[1] The lease executed by Sorenson covers only minerals at "shallow" depths, stating: "This lease covers only those rights from the surface to the base of the Tertiary Age coal or 2,500 fee subsurface, whichever is deeper."

[2] Because the parties entered into the surface damage and use agreement, Pennaco no longer ran the risk of exceeding the requirements of reasonable use and accommodation that restrict a mineral lessee's use of the surface estate. *See, e.g., Mingo Oil Producers v. Kamp Cattle Co.*, 776 P.2d 736, 739-42 (Wyo. 1989).

[3] "A rod is 16.5 linear feet." *Barlow Ranch, Ltd. P'ship v. Greencore Pipeline Co. LLC*, 2013 WY 34, ¶ 10 n.3, 301 P.3d 75, 81 n.3 (Wyo. 2013).

[¶9]    Pennaco also agreed to restore and reseed well sites, to remove all above-ground equipment, and to restore the land to its original state when mineral production ended.  It was also required to return roads and other rights-of-way to a condition as close to the land's original state as reasonably possible.  It promised to restore any of Sorenson's water wells or natural artesian springs that were impaired by the coalbed methane operations, either by reconfiguring or redrilling them, or by drilling new water wells if necessary.

[¶10]  With the surface damage and use agreement in place, Pennaco began developing its coalbed methane operation on Sorenson's ranch.  It drilled ten coalbed methane wells, constructed 5.67 miles (1,815.37 rods) of road, and installed 4.19 miles (1,343.57 rods) of pipeline.  It also constructed four water disposal pits to store water produced by the wells.

[¶11] Pennaco made the annual payments required by the surface damage and use agreement through 2010.  However, in 2009, Pennaco wrote Sorenson that it intended to shut-in[4] some or all of its coalbed methane wells on the ranch.[5]  In early 2010, when Pennaco was shutting down its operations, Sorenson contacted Pennaco's landman regarding reclamation of the coalbed methane operations, including reclaiming the four water disposal pits (otherwise referred to as reservoirs).  Pennaco's landman wrote to him in response on June 11, 2010, stating in part: "Pennaco affirms by the Surface Damage and Surface Use Agreement ("SUA") dated April 13, 2001 . . . that upon termination of the productive life of the producing field in conjunction with the following impoundments that if you elect not to retain the reservoirs for personal use that Pennaco will reclaim them."

[¶12]  A few weeks later, Pennaco entered into a purchase and sale agreement effective July 1, 2010 with CEP-M.  As part of the sale,[6] Pennaco assigned its interest in the lease underlying Sorenson's ranch lands and rights in the surface damage and use agreement to CEP-M.  That entity then assigned its interests to High Plains Gas.  According to Sorenson, the wells, pipelines, and roads were for all practical purposes abandoned.

---

[4] A well that is shut-in is "not currently considered active in which the completion interval has not been isolated from the wellbore above and where the wellbore condition is such that its utility may be restored by opening valves or by energizing equipment involved in operating the well."  Wyoming Oil & Gas Conservation Commission Rules, Ch. 1 § 2(vv) (filed June 3, 2015), *available at* http://soswy.state.wy.us /Rules/RULES/9859.pdf.

[5] A year later, in February of 2010, Pennaco notified Sorenson that he had the right to assume ownership of the coalbed methane wells on his property in order to convert them to stock water wells.  Sorenson responded and indicated he wanted to take ownership of three of the wells.  However, the three coalbed methane wells were never converted to stock water wells because Pennaco never finished plugging them. In any event, Sorenson did not seek damages for the cost of reclaiming them.

[6] The sale affected a number of other coalbed methane properties. *See KD Co. LLC, supra.*

[¶13] After the assignment in 2010, Pennaco did not pay annual payments or reclaim any of Sorenson's land as required by the surface damage and use agreement. The assignees did not do so either. Accordingly, Sorenson gave Pennaco written notice of its default and of the impairment of his water sources as was required under the surface damage and use agreement. Pennaco still did not perform these obligations after receiving notice that Sorenson claimed it was in violation of the contract.

[¶14] Sorenson then sued Pennaco and the assignees to collect the annual payments and to enforce the reclamation obligations he was owed under the surface damage and use agreement. CEP-M and High Plains Gas failed to answer or otherwise respond to the complaint, and as a result, the district court entered a default judgment against them.[7] Pennaco answered, generally denying Sorenson's claims.

[¶15] In due course, Pennaco filed a motion for summary judgment in which it claimed that it was no longer required to perform the obligations in the surface damage and use agreement. It argued that the exculpatory clause included in the mineral lease[8] was incorporated by reference into the surface damage and use agreement, and that as a result, it was no longer liable after assignment. Alternatively, it argued that obligations in the surface damage and use agreement constitute covenants running with the ownership of the mineral estate that benefits from using an easement on the surface estate. Thus, it asserted, because the obligations are considered covenants running with the land, those obligations passed from Pennaco to CEP-M when the mineral estate and surface damage and use agreement was assigned, leaving Pennaco free and clear of any continued liability. Sorenson argued in response that Pennaco continued to be bound to perform the obligations in the contract after assignment by basic principles of contract law. Sorenson contended that because there was neither an exculpatory clause in the contract nor a subsequent novation, Pennaco remained on the hook.

[¶16] The district court denied Pennaco's motion for summary judgment, finding that the company was not entitled to judgment as a matter of law. By virtue of its analysis and ultimate conclusion, the district court decided in effect that Pennaco remained liable under the surface damage and use agreement. Accordingly, Pennaco's continued liability was treated as a foregone legal conclusion by the parties and the district court, and it was no longer an issue for jury trial. The trial instead focused on the amount of damages owed by Pennaco for breach of the contract.

[¶17] The damage case was tried to a jury over a four-day period. After Sorenson rested his principal case, Pennaco moved for judgment as a matter of law pursuant to W.R.C.P. 50(a), but in its motion it only challenged the sufficiency of the evidence to support

---

[7] Both entities are evidently bankrupt and/or judgment proof.

[8] Pennaco's oil and gas lease covering Sorenson's minerals contains the following exculpatory clause: "If all or any part of this lease is assigned, no leasehold owner shall be liable for any act or omission of any other leasehold owner."

4

Sorenson's claims for damages. It did not raise the legal issue of whether it was liable under the surface damage and use agreement after assignment. The district court denied the motion, and Pennaco then presented its case.

[¶18] The court's charge to the jury included an instruction not objected to by Pennaco indicating that the court had previously determined that Pennaco was obligated to honor the surface damage and use agreement it entered into with Sorenson, and that it was required to fulfill its obligations under the agreement regardless of whether it sold or assigned it to CEP-M.

[¶19] The jury returned a verdict finding that Sorenson had suffered damages of: (1) $76,033.62 for unpaid annual surface payments; (2) $883,732.00 for the costs of reclaiming Pennaco's operations; and (3) $96,217.00 for the cost of replacing an artesian spring that had been damaged by Pennaco's drilling operations.[9] The district court subsequently entered judgment in favor of Sorenson in the amount of $1,055,982.62. Pennaco renewed its motion for judgment as a matter of law concerning damages pursuant to W.R.C.P. 50(b), this time tersely touching upon the legal issue of its liability under the assigned contract.

[¶20] Sorenson then moved for an award of costs and attorney fees under the surface damage and use agreement, which provided: "Operator, if determined by a court of competent jurisdiction to be in default, will be responsible for all reasonable legal fees and costs." Although Sorenson's counsel took the case on a contingent fee arrangement, they meticulously tracked the hours they worked on the case.

[¶21] Applying the lodestar test, the district court first determined the total fee that would have been charged based upon the number of hours worked times Sorenson's attorneys' usual hourly rate—$124,591.25. It then considered the factors listed in Wyo. Stat. Ann. § 1-14-126(b) to decide whether an upward or downward adjustment to the fee was warranted. Applying several of those factors, the district court awarded Sorenson attorney fees in the amount of $311,478.13.

[¶22] Pennaco timely perfected this appeal.

## DISCUSSION

### *Pennaco's Contractual Obligations after Assignment*

[¶23] We must first address Sorenson's assertion that Pennaco did not preserve the legal issue of whether it remains liable for obligations under the surface damage and use

---

[9] The jury did not award Sorenson damages he sought for the repair of an additional water well.

agreement after assignment for appellate review. This complication arises out of the order denying Pennaco's motion for summary judgment.

[¶24] Although it denied Pennaco's motion, the order also resulted in an affirmative legal ruling somewhat akin to that made possible by the procedures found in W.R.C.P. 56(c)-(d).[10] The district court determined, in essence, that Pennaco remained liable after assignment as a matter of law. Although the order did not say this in so many words, the parties and the court interpreted it that way, and it is easy to see why they did. The trial was accordingly limited to causation and damages. A separate order granting a partial summary judgment in favor of Sorenson on the issue of Pennaco's continuing duty to perform under the contract was neither requested by the parties nor entered *sua sponte* by the district court.[11]

[¶25] On appeal, Sorenson takes an austere view of the situation, urging that because the ruling denied Pennaco's motion for summary judgment, and because Pennaco failed to challenge the legal ruling on liability through a W.R.C.P. 50(a) motion, the issue was not preserved for our review. It is true "that challenges to the denial of a defendant's summary judgment motion are generally not reviewable." *Halvorson v. Sweetwater Cty. Sch. Dist. No. 1*, 2015 WY 18, ¶ 21, 342 P.3d 395, 402 (Wyo. 2015). We have explained that "[t]he proper procedural mechanism for challenging an adverse judgment, following

---

[10] These procedural rules state in pertinent part:

> (c) *Motion and proceedings thereon*. – . . . A summary judgment, interlocutory in character, may be rendered on the issue of liability alone although there is a genuine issue as to the amount of damages.

> (d) *Case not fully adjudicated on motion*. – If on motion under this rule judgment is not rendered upon the whole case or for all the relief asked and a trial is necessary, the court at the hearing of the motion, by examining the pleadings and the evidence before it and by interrogating counsel, shall if practicable ascertain what material facts exist without substantial controversy and what material facts are actually and in good faith controverted. It shall thereupon make an order specifying the facts that appear without substantial controversy, including the extent to which the amount of damages or other relief is not in controversy, and directing such further proceedings in the action as are just. Upon the trial of the action the facts so specified shall be deemed established, and the trial shall be conducted accordingly.

W.R.C.P. 56(c)-(d).
[11] A court can grant summary judgment (or partial summary judgment) to a non-moving party so long as the issue on which the ruling has been made has been completely presented to it. *Basic Energy Services, L.P. v. Petroleum Resource Management, Corp.*, 2015 WY 22, ¶ 20 n.11, 343 P.3d 783, 789 n.11 (Wyo. 2015) (citing *City of Powell v. Busboom*, 2002 WY 58, ¶ 6, 44 P.3d 63, 65 (Wyo. 2002); *Union Pac. R.R. Co. v. Caballo Coal Co.*, 2011 WY 24, ¶ 33 n.4, 246 P.3d 867, 876 n.4 (Wyo. 2011)).

a trial on the merits, is a motion for judgment as a matter of law." *Cargill, Inc. v. Mountain Cement Co.*, 891 P.2d 57, 61 (Wyo. 1995).

[¶26] We see Sorenson's point, but there is more to the order than just the denial of Pennaco's summary judgment motion. After studying the order and rest of the record, we conclude that the order denying Pennaco's motion determined as a matter of law that Pennaco remained liable for the obligations in the surface damage and use agreement. The ruling did not leave questions of fact for a jury to determine as to Pennaco's contractual duties, but only as to the damages caused by any breach of its obligations. *See* W.R.C.P. 56(c); *see also Wheatland Irr. Dist. v. McGuire*, 537 P.2d 1128, 1129-30 (Wyo. 1975); *cf.* 10B Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure, Civil* § 2736 (3d ed., database updated April 2015). That ruling then became the law of the case, although it was not appealable until it was subsumed into a final judgment on the entire case after the trial. *See Big-D Signature Corp. v. Sterrett Properties, LLC*, 2012 WY 138, ¶ 18, 288 P.3d 72, 77 (Wyo. 2012). As a result, the issue was preserved for our review.[12]

---

[12] We take this opportunity to encourage trial courts to prepare a final pretrial order pursuant to W.R.C.P. 16(e) in cases in which it holds a pretrial conference, and offer the parties a period of time to object to the accuracy of its contents. This will aid in distilling the issues, clarify any confusion before trial, and control the subsequent course of action. It will not only help the judge and the parties during trial, but it also will simplify this Court's review on appeal. Guidance can be taken from an authoritative secondary source:

> At the close of any pretrial conference the court should issue an order reciting the action taken at the conference—the amendments to the pleadings that were allowed, the agreements made by the parties, the admissions as to issues of fact or the genuineness or the admissibility of documents, the stipulations of the parties as to the facts or issues to be tried, and the issues not disposed of and therefore remaining for trial. A pretrial order may have the effect of determining the sufficiency of a defense, may preserve a defense or claim that normally would be waived by proceeding to judgment, or simply may require the filing of statements or evidentiary or witness lists.

> Pretrial orders are intended to further the purposes of the conference. As stated by Judge Charles E. Clark: "A pre-trial order is an absolute necessity if the good accomplished by the conference itself is to be preserved for the further disposition of the case and in the trial itself." Recognizing the importance of the pretrial order at least one district court confronted with an unclear order has set it aside and called a second conference. Similarly, an appellate court, after finding that the pretrial order relied upon by the lower court was not sufficiently definitive to provide adequate guidance, remanded the case and directed the trial court to start again.

6A Wright & Miller, *supra,* § 1526.

[¶27] Turning to the merits, Pennaco posits that in construing the surface damage and use agreement, this Court must apply real property principles because the agreement creates real property interests. It contends that if such principles are followed—namely those found in the Restatement (Third) of Property: Servitudes § 4.4—the only possible conclusion is that the obligations are covenants running with the land, and therefore the covenant obligations are owed only by the owner at the time the covenant obligation is to be performed. Pennaco says its obligations passed like a quarterback passes the football to a receiver—once the ball is passed, the receiver has it, and the quarterback does not. We view Pennaco's attempts to relieve itself of the obligations it bargained to perform more as a game of hot potato.

[¶28] The Court recently dealt with this subject in *Pennaco Energy, Inc. v. KD Co. LLC, supra*. As in this case, the controlling issue was whether the relationship established between Pennaco and the landowners by the surface agreements was primarily contractual, or whether it was instead based on privity of estate involving covenants running with the land. 2015 WY 152, ¶ 16, 363 P.3d at 22. After a thorough analysis, we concluded the relationship was the former. *Id.* at ¶ 87, 363 P.3d at 40.

[¶29] We began our analysis in *KD Co. LLC* by examining well-established principles of contract law concerning assignment and delegation. *Id.* at ¶ 17, 363 P.3d at 23. Rights under a contract are assigned and contractual duties are delegated. *Id.* (quoting Joseph M. Perillo, *Contracts* § 18.25, 665-66 (7th ed. 2014)). The assignor of a right usually has no interest in the contractual rights after assignment. *Id.* However, and importantly here, when a duty is delegated, the delegant remains liable. *Id.* "If this was not so, every solvent person could obtain freedom from debts by delegating them to an insolvent." *Id.* While the delegant can appoint another to render performance on the obligor's behalf, such a delegation of a duty "does not free the obligor-delegant from the duty to see to it that performance is rendered, unless there is a novation." *Id.*

[¶30] These same principles of contract law apply to oil and gas leases. *Id.* at ¶ 18, 363 P.3d at 23-24; 2-19 Eugene O. Kuntz, *Law of Oil and Gas* § 19.17 ("Undoubtedly, the generally accepted principles of contract law apply."). It is well settled in oil and gas law that, absent an express exculpatory clause, a lessee continues to remain liable to the lessor for a breach of an express covenant in the oil and gas lease after assignment, even if the express covenants run with the land:

> Absent an express clause that terminates its obligations, the original lessee-assignor will continue to be responsible to the lessor for covenants in the lease under the doctrine of privity of contract. Many oil and gas leases contain clauses eliminating contractual liability of this nature, but some do not. Where they do not, the courts are nearly universal in their finding that the original lessee-assignor retains obligations to

8

the lessor with respect to at least some of the covenants under the lease.

*KD Co. LLC*, ¶ 18, 363 P.3d at 23 (citation omitted); *see also* 2-4 Williams & Meyers, *Oil & Gas Law* § 403.1 ("The original lessee continues [to be] liable to the lessor for a breach of an express covenant of the lease occurring after his assignment of the lease unless the lease contains a clause excusing him from further liability after assignment."); 5-64 Kuntz, *supra,* § 64.6 ("Under traditional landlord-tenant law, a landlord can hold both the original tenant and the tenant's assignee liable for breach of a lease covenant that runs with the estate. The original tenant is liable under the initial contractual agreement (privity of contract) with the lessor, and the assignee is liable because it has accepted the benefit of the leasehold estate and must accept its attached burdens as well (privity of estate).").

[¶31]   The oil and gas lease between Sorenson and Pennaco includes such an exculpatory clause, adhering to the aforementioned principles.  It states: "If all or any part of this lease is assigned, no leasehold owner shall be liable for any act or omission of any other leasehold owner."  Accordingly, upon assignment Pennaco was relieved from that point of the obligations set forth in that lease.  *See* 4-6 Williams & Meyers, *supra,* § 677.

[¶32]   While the oil and gas lease contains an exculpatory clause, the surface damage and use agreement does not state that the lease is incorporated by reference.  As a result, the surface damage and use agreement does not incorporate the exculpatory clause contained in the lease.  We have made clear:

> Under general contract principles, when a contract expressly refers to and incorporates another instrument in specific terms which show a clear intent to incorporate that instrument into the contract, both instruments are to be construed together. However, in order for an instrument to be incorporated into and become part of a contract, the instrument must actually be incorporated. It is not enough for the contract to merely mention the instrument; the referring language in the contract must demonstrate the parties intended to incorporate all or part of the referenced instrument. Parties do not undertake obligations contained in a separate document unless their contract clearly says so. A reference in a contract to another instrument will incorporate the other instrument only to the extent indicated and for the specific purpose indicated.

*KD Co. LLC*, ¶ 79, 363 P.3d at 38-39 (citations omitted).

9

[¶33] Because the surface damage and use agreement neither includes an exculpatory clause nor states that the oil and gas lease is incorporated by reference, Pennaco contends that the agreement is wholly different from and completely unrelated to the lease. That would mean, according to Pennaco, that the same contract principles do not apply. However, our study of this area of law reveals otherwise. The surface damage and use agreement is in the same genus as the oil and gas lease. They are yoked together by the very nature of the underlying subject matter of oil and gas development. Indeed, if there were no oil and gas lease, there would be no need for a surface damage and use agreement, the latter being a derivative of the former.

[¶34] To further understand the connection between these allied contracts, it may be helpful to look at the anatomy of a typical oil and gas lease. Several secondary authorities elucidate that oil and gas leases can contain various provisions and covenants akin to those found in a surface agreement.

[¶35] A typical lease contains a provision authorizing assignments by the lessee, leaving no question of the assignability of the lessee's estate. 2-4 Williams & Meyers, *supra,* § 402; *see also* 2-19 Kuntz, *supra,* § 19.17; 3 Nancy St. Paul, *Summers Oil and Gas* § 28:1-28.2 (3d ed., database updated 2015). A common example of a provision concerning the assignability of the parties' interest is as follows: "The rights of either party hereunder may be assigned in whole or in part and the provisions hereof shall extend to the heirs, executors, administrators, successors and assigns." 4-6 Williams & Meyers, *supra,* § 677.2; *see also* 4-51 Kuntz, *supra,* § 51.2(a) (discussing general assignment clause relating to transfer by lessee).

[¶36] When a lease does not contain express assignment language, an agreement to allow assignment may still be implied by a provision regarding the running of the covenants of the lease to assignees. 2-4 Williams & Meyers, *supra,* § 402; 4-6 Williams & Meyers, *supra,* § 677.2. It is normal for a lease to have an express provision for the running of the covenants of the lease to any transferee; and therefore, many contain that language.[13] 4-6 Williams & Meyers, *supra,* § 677.2; *see also* 2-4 Williams & Meyers, *supra,* § 412; 5-64 Kuntz, *supra,* § 64.2, 64.7.

---

[13] Williams and Meyers provides some representative examples of clauses providing for the running of covenants:

> All covenants and agreements herein set forth between the parties hereto, shall extend to their respective heirs, legal representatives and assigns.
>
> All terms, conditions, limitations and covenants between the parties hereto shall extend to their respective heirs, successors, personal representatives and assigns. The covenants herein on behalf of the "Lessor" are the joint and several covenants of each of the parties of the first part.

[¶37] As to other provisions governing the use of and damage to the surface estate, an oil and gas lease can provide these parameters. Generally a lease will explicitly provide for certain easements for the benefit of the lessee. 4-6 Williams & Meyers, *supra,* § 673; *see also* 1-2 Williams & Meyers, *supra,* § 218. Lessees are "usually given more extensive easements inasmuch as their operations require the use of the surface for a well site or sites, machinery, pipe lines, roads, etc." 1-2 Williams & Meyers, *supra,* § 218. Indeed, provisions can be included concerning the lessee's rights to the surface include fencing and buried pipe covenants as well as reclamation obligations. *Id.* § 218.11; *see also* 4-49 Kuntz, *supra,* § 49.4 (analyzing surface damage clause in lease)*,* and § 49.6 (examining restoration of premises clause in lease); 5 St. Paul, *supra,* § 61:2 (providing a sample surface agreement).

[¶38] A few lessons are learned from the above. An oil and gas lease can contain covenants dealing with surface issues. Furthermore, even though oil and gas leases usually include assignment and covenant running with the land language, contract principles still control, and the lessee continues to remain liable for the obligations in the lease even after an assignment. To avoid continued liability, the lease must include an exculpatory clause, or the lessee must subsequently obtain a novation. This point has been stated perfectly:

> In view of the fact that the lessee will normally continue subject to the terms and obligations of the lease despite an assignment of his interest therein, he may provide in the lease that upon assignment he shall be relieved of all obligations thereunder. The following clause[] . . . [is] typical of provisions of this kind: "An assignment of this lease, in whole or in part, shall, to the extent of such assignment, relieve and discharge lessee of any obligations hereunder."

4-6 Williams & Meyers, *supra,* § 677.3; *see also* 4-51 Kuntz, *supra,* § 51.2(c) ("It is not uncommon for the general assignment clause to contain a special provision for release of the lessee upon an assignment of the lease. Such special provision will be referred to herein as the clause releasing lessee after an assignment. In the absence of such clause,

---

> All the covenants, obligations and considerations of this lease shall extend to and be binding upon the parties hereto, their heirs, executors, administrators, successors, assigns and successive assigns.
>
> This lease and all its terms, conditions, and stipulations shall extend to and be binding on all the heirs, grantees, successors or assigns of said Lessor or Lessee.

4-6 Williams & Meyers, *supra*, § 677.2.

because of the privity of contract that exists between the lessor and lessee of an oil and gas lease, the lessee remains liable for the performance of covenants contained in the lease after having assigned all interest therein."); 5-64 Kuntz, *supra*, § 64.7; 3 St. Paul, *supra*, § 28:11 ("The principles of law governing contracts for the assignment of oil and gas leases as to their formation, interpretation, performance, and breach are no different from principles governing ordinary contracts for the transfer of an interest in land."), and § 28:12 ("Assignments of oil and gas leases are contracts and are interpreted in accordance with the general rules of contract interpretation.").

[¶39] The aforementioned observations concerning provisions and covenants found in oil and gas leases demonstrate that they are similar to the types found in surface agreements like the one in this case. When terms concerning liability for surface damage and permissible use of the surface are not provided in sufficient detail in the lease, the parties often negotiate a surface agreement. It has been observed that:

> Lessor and lessee not infrequently enter into a separate surface use agreement in addition to the lease, which may contain specific use provisions. It is necessary to review such instruments carefully to determine whether they modify the rights and duties of the parties.

4-6 Williams & Meyers, *supra*, § 673. Further reinforcing this point, in Wyoming an oil and gas operator's entry upon the land for operations is statutorily conditioned on "attempting good faith negotiations and . . . [o]btaining an executed surface use agreement providing for compensation to the surface owner for damages to the land and improvements . . . ." Wyo. Stat. Ann. § 30-5-402(c)(ii) (LexisNexis 2015).

[¶40] Pennaco's argument that surface agreements are categorically different than oil and gas leases falls apart based upon the above. The oil and gas lease between Pennaco and Sorenson did not include detailed covenants concerning surface damage and use or reclamation, although such covenants could certainly have been negotiated into the lease.[14] Before entering upon Sorenson's land, Pennaco therefore bargained for the surface damage and use agreement, which contains specific surface damage, use and reclamation provisions not found in the lease.

[¶41] Harkening back to the controlling question, there is no doubt that the surface damage and use agreement is a contract governing permissible use, compensation for damage, and required reclamation of Sorenson's land. We must therefore construe it in accordance with settled principles of contract interpretation. *KD Co. LLC*, ¶ 25, 363 P.3d

---

[14] The oil and gas lease did provide some general terms regarding the use of Sorenson's surface, granting Pennaco "rights of way and easements for laying pipe lines, and erection of structures" for its operations in producing coalbed methane.

at 25-26.  We begin by considering *de novo* the plain language of the contract.  *Id.*  When that language is clear and unambiguous, our inquiry is limited to the four corners of the document, giving the words contained therein their ordinary meaning.  *Id.*  The parties are free to agree to whatever lawful terms they desire, and we will not rewrite the agreement under the guise of judicial construction.  *Id.*  Only when the contract is ambiguous do we apply our rules of construction.  *Id.*  A contract is ambiguous if indefiniteness of expression or double meaning obscures the parties' intent.

[¶42]  Reviewing the plain language of the surface damage and use agreement, it is clear that Sorenson intended to grant Pennaco and "its agents, employees and assigns" the right to enter and use the lands described for coalbed methane operations in the manner outlined therein.  The contract states that this grant of right-of-way "shall be a covenant running with the lease.  Any assignment(s) of the Leasehold covering Owner's lands . . . shall be made subject to this agreement, and all such assignees shall be bound by the terms thereof."

[¶43]  In exchange for the access rights granted, Pennaco assumed several obligations, including:

- Making annual payments to Sorenson for well sites, roads, and pipelines, measured in terms of number of well sites and length of roads and pipelines.[15] Pennaco agreed to make said payments "until such time as the property is restored and reclaimed."

- Reclaiming Sorenson's lands by restoring and reseeding well sites, cleaning and removing all above ground equipment and restoring the surface as close to its original state, and returning any roads and other right-of-ways and sites as close to their original condition.

- Restoring any water wells that were impaired by the coalbed methane operations.

[¶44]  The contract contains nothing indicating that the parties intended servitudes to be created under property law principles so that Pennaco would be able to relieve itself of these obligations merely by assigning them to a third party.  The obligations to reclaim

---

[15] The surface damage and use agreement states:  "The annual payments shall commence one (1) year from the date of the original payment, and shall allow OPERATOR a right-of-way and easement, to be used by OPERATOR, its agents, servants, employees and successors in interest as long as the annual payments are made."  While Pennaco points to the term "easement" in support of its position that the obligations equate to a servitude, we find this isolated reference cannot be interpreted to create a permanent easement.  *See Hasvold v. Park Cnty. School Dist. No. 6*, 2002 WY 65, 45 P.3d 635 (Wyo. 2002).  The nature of the right away granted under the contract was to enable Pennaco access to its mineral estate and terminated when the coalbed methane operations terminated.  Simply put, the parties did not intend to create a perpetual easement.

the surface estate and to pay until reclamation is complete "presume an ability and willingness to perform after production ends." *KD Co. LLC*, ¶ 36, 363 P.3d at 28. These obligations are not the kind that the parties would expect to be performed only by the last assignee of Pennaco; that is, the one holding the proverbial hot potato by assignment. As we explained in *KD Co. LLC*, "[t]hey are logically connected to Pennaco, its financial ability, and its initial creation of the gas operation, rather than to whatever the last assignee may have done." *Id*.

[¶45]  Contrary to Pennaco's position, oil and gas leases and surface agreements are of the same breed of contract and the need for an exculpatory clause applies equally to both. Based on the plain language in the surface damage and use agreement, we hold that the parties intended for Pennaco to remain responsible for obligations in the agreement until coalbed methane operations ceased and Sorenson's land was reclaimed.[16]  If Pennaco intended to be released from liability for a breach occurring after assignment, it could have negotiated an exculpatory clause in the contract.[17]  Absent such a clause, Pennaco could have tried to obtain a novation from Sorenson at the time of assignment. It did neither.

[¶46]  To find that the assignment released Pennaco from its obligations would require us to read an exculpatory clause that expressly terminated Pennaco's obligations upon assignment into the contract. There is no such clause, and we are not at liberty to rewrite the agreement. *See KD Co. LLC*, ¶¶ 37-38, 363 P.3d at 28-29. Applying our usual standard of review of summary judgment, *see id*, ¶ 14, 363 P.3d at 22, we conclude that the district court did not err in ruling as a matter of law that Pennaco remained liable under the surface damage and use agreement after assignment to CEP-M.

### *Amount of Attorney Fees Awarded to Sorenson*

[¶47]  Wyoming follows the American rule, which provides that each party is responsible for his or her own attorney fees. *Positive Progressions, LLC v. Landerman*, 2015 WY 138, ¶ 29, 360 P.3d 1006, 1016 (Wyo. 2015). There are narrow exceptions, however.

---

[16] We do not pretend to know what secret thoughts Pennaco had on this subject. We can only enforce the intent reflected in the language of the agreement.

[17] The surface damage and use agreement includes a provision on the topic of assignees, which states:

> **Assignees Bound**:  This agreement shall be binding upon the parties herein, their agents, employees, successors, and assigns.  If the CBM lease or operation in question is sold, transferred or assigned, the OPERATOR shall notify the OWNER and the new OPERATOR of the well, or wells, shall be bound by the terms of this agreement.

A logical place to have included an exculpatory clause releasing Pennaco from liability after assignment would have been within or immediately following this provision.

Attorney fees can be recovered where a contractual or statutory provision authorizes them, or as a form of punitive damages when such damages can properly be awarded. *Id.*

[¶48] The surface damage and use agreement contains the following fee-shifting provision: "Operator, if determined by a court of competent jurisdiction to be in default, will be responsible for all reasonable legal fees and costs." Based upon this provision, and in accordance with W.R.C.P. 54(d), Sorenson requested and was granted an award of attorney fees and costs.[18]

[¶49] Sorenson provided documentation showing that his attorneys' total fees based on their hourly rate were $124,591.25. He requested that the award be enhanced beyond that figure to account for the fact that he and his attorneys had entered into a contingent fee agreement. Under that agreement, Sorenson's attorneys were entitled to 40% of the gross recovery after a trial. That amounts to $422,393.04 on the $1,055,982.62 judgment.

[¶50] Sorenson did not request that the full contingency amount be awarded; rather, he requested that the district court multiply the $124,591.25 by a factor of three and award fees of $373,773.75. Applying Wyoming law and consulting other jurisdictions, the district court adjusted the $124,591.25 upward 2.5 times, awarding attorney fees in the amount of $311,478.13.

[¶51] Whether a court can award attorney fees is a question of law to be reviewed *de novo. KD Co. LLC*, ¶ 15, 363 P.3d at 22. We review the amount of the award for an abuse of discretion. *Id.* We have explained:

> [A]n award of attorney fees is generally not the result of a mathematical computation. The fees described by affidavit are merely the starting point of the analysis, and it is through a court's exercise of discretion that it determines what portion of the amount requested is reasonable and equitable under the particular circumstances of a given case.

*Thorkildsen v. Belden*, 2012 WY 8, ¶ 11, 269 P.3d 421, 424 (Wyo. 2012).

[¶52] To determine the reasonableness of the attorney fee award, our courts follow the two-factor federal lodestar test: "(1) whether the fee charged represents the product of reasonable hours times a reasonable rate; and (2) whether other factors of discretionary application should be considered to adjust the fee either upward or downward." *Positive Progressions, LLC*, ¶ 29, 360 P.3d at 1016 (quoting *Alexander v. Meduna*, 2002 WY 83,

---

[18] The narrow issue raised on appeal by Pennaco deals with the amount of attorney fees awarded. Pennaco does not contest the amount of costs awarded—$21,181.84— and so we will not address that portion of the award any further.

¶ 49, 47 P.3d 206, 220-21 (Wyo. 2002)); *Thorkildsen*, ¶ 10, 269 P.3d at 424. The Wyoming legislature directed our courts to consider the following factors to guide their discretion and to help them arrive at a reasonable fee award:

> (b) In civil actions for which an award of attorney's fees is authorized, the court in its discretion may award reasonable attorney's fees to the prevailing party without requiring expert testimony. In exercising its discretion the court may consider the following factors:
>
> (i) The time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;
>
> (ii) The likelihood that the acceptance of the particular employment precluded other employment by the lawyer;
>
> (iii) The fee customarily charged in the locality for similar legal services;
>
> (iv) The amount involved and the results obtained;
>
> (v) The time limitations imposed by the client or by the circumstances;
>
> (vi) The nature and length of the professional relationship with the client;
>
> (vii) The experience, reputation and ability of the lawyer or lawyers performing the services; and
>
> **(viii) Whether the fee is fixed or contingent.**

Wyo. Stat. Ann. § 1-14-126(b)(i)-(viii) (LexisNexis 2015) (emphasis added); *see Dishman v. First Interstate Bank*, 2015 WY 154, ¶ 15, 362 P.3d 360, 365-66 (Wyo. 2015).

[¶53] The district court appropriately took the first step in establishing a reasonable fee by multiplying the number of hours worked by the attorneys' usual hourly rate, and by that calculation arrived at $124,591.25. It reviewed affidavits and other supporting information provided by Sorenson, and determined that the amount of time and the hourly rate were reasonable under the circumstances. *See Dishman*, ¶ 14, 362 P.3d at 365.

[¶54] For the second step in its analysis, the district court correctly consulted § 1-14-126(b) and considered the listed factors to decide whether to adjust the fee either upward or downward to arrive at a reasonable amount. *See Thorkildsen* ¶ 10, 269 P.3d at 424. Because Sorenson's attorneys took the case on a contingent fee basis, the statute obliged the judge to consider that fact in determining the reasonable amount to award in attorney fees because factor (viii) expressly provides for consideration of "[w]hether the fee is fixed or contingent." *See* Wyo. Stat. Ann. § 1-14-126(b)(viii).

16

[¶55] Pennaco says that under no circumstances should attorney fees be enhanced to account for contingent fee agreements. In support of its position, Pennaco relies chiefly on the United States Supreme Court case of *City of Burlington v. Dague*, 505 U.S. 557, 112 S.Ct. 2638, 120 L.Ed.2d 449 (1992). There our nation's highest court ruled that the fee shifting provisions of the Solid Waste Disposal Act and the Clean Water Act did not allow for the enhancement of fees based upon a contingent fee agreement under the lodestar method. *Id.* at 562-67, 112 S.Ct. at 2641-44. It noted the difficulty of determining the risk associated with any case and the possibility of "double counting" fees if factors used in allowing the enhancement have already been subsumed in the lodestar analysis. *Id.* at 563, 112 S.Ct. at 2641.

[¶56] Pennaco's reliance on *Dague* is unconvincing. Our careful review of *Dague* does not indicate there was an applicable statute or rule that expressly required consideration of a contingent fee agreement as Wyoming's § 1-14-126 does. If we were to accept Pennaco's position, we would have to decide that the legislature included meaningless language in § 1-14-126(b)(viii), which this Court will not do. *See City of Casper v. Holloway*, 2015 WY 93, ¶ 37, 354 P.3d 65, 75-76 (Wyo. 2015).

[¶57] Furthermore, the United States Supreme Court has softened its position somewhat since *Dague*. *See* 10 Wright & Miller, *supra,* § 2675.2. In *Perdue v. Kenny A.*, 559 U.S. 542, 130 S.Ct. 1662, 176 L.Ed.2d 494 (2010), for example, it seems to have left the door open for a contingent fee enhancement multiplier in a 42 U.S.C. § 1983 case in rare circumstances.

> In light of what we have said in prior cases, we reject any contention that a fee determined by the lodestar method may not be enhanced in any situation. The lodestar method was never intended to be conclusive in all circumstances. Instead, there is a "strong presumption" that the lodestar figure is reasonable, but that presumption may be overcome in those rare circumstances in which the lodestar does not adequately take into account a factor that may properly be considered in determining a reasonable fee.

*Id*. at 553-54, 130 S.Ct. at 1673.

[¶58] Our legislature expressly provided that whether a fee is fixed or contingent is a factor that may properly be considered in adjusting the lodestar amount either upward or downward to arrive at a reasonable fee award. *See* Wyo. Stat. Ann. § 1-14-126(b)(viii); *see also* 20 Am. Jur. 2d *Costs* § 55 (2d ed. 2016 update) ("A court may consider a contingent fee agreement and the amount it would have generated as evidence of usual and customary fees in determining both the reasonableness and the amount of an award

of attorney's fees."); 20 C.J.S. *Costs* § 148 (database updated Dec. 2015) ("An agreement between attorney and client concerning fees is not controlling, but a contingency agreement may be considered when considering the discretionary factors governing an award."). Because the district court correctly considered this factor, the question becomes whether it abused its discretion by enhancing the lodestar amount by 2.5 times. We cannot say it did.

[¶59] This Court recognizes that our precedent on the subject of contingent fee multipliers is slim. However, courts from other jurisdictions have dealt with the issue, and their decisions provide helpful guidance. In Florida, courts analyze three factors in evaluating the impact of contingent fee agreements in contract cases: "(1) whether the relevant market requires a contingency fee multiplier to obtain competent counsel; (2) whether the attorney was able to mitigate the risk of nonpayment in any way; and (3) whether any of the factors set forth in *Rowe*[19] are applicable, especially, the amount involved, the results obtained, and the type of fee arrangement between the attorney and his client." *Standard Guar. Ins. Co. v. Quanstrom*, 555 So.2d 828, 834 (Fla. 1990); *see TRG Columbus Dev. Venture, Ltd. v. Sifontes*, 163 So.3d 548, 550 (Fla. Dist. Ct. App. 2015) (affirming contingent fee multiplier of 2.0); *Citizens Prop. Ins. Corp. v. Pulloquinga*, No. 3D14-1248, 2015 WL 9584387, at *3 (Fla. Dist. Ct. App. Dec. 30, 2015) (affirming the application of a 1.5 contingent fee multiplier). A movant must present evidence of these factors to justify a multiplier. *Quanstrom*, 555 So.2d at 834.

[¶60] The district court followed Florida's lead; it not only considered the discretionary factors in § 1-14-126(b), but also applied the three factors in *Quanstrom*. The court was presented with evidence[20] that Sorenson sought out an attorney concerning his dispute with Pennaco, but was unable to afford that attorney's hourly rate to bring a lawsuit. Sorenson then tried to work things out with Pennaco himself, but his efforts were unsuccessful. A year later, Sorenson contacted his current counsel, who agreed to take the case on contingency because Sorenson could not afford the firm's hourly rate. Additional evidence supported a conclusion that without an attorney willing to accept the case on a contingent fee basis, Sorenson likely would not have been able to successfully pursue his claims.

[¶61] The district court concluded that Sorenson proved that in order for a landowner like himself to engage competent counsel for representation in a lawsuit of this type, he had to enter into a contingent fee agreement. It held that "the current market demands the average Wyoming landowner seeking counsel for representation against an oil and gas

---

[19] *Florida Patient's Compensation Fund v. Rowe*, 472 So.2d 1145, 1150-51 (Fla. 1985).
[20] Sorenson presented affidavits from himself and his attorney, as well as an opinion from an experienced attorney located in northeast Wyoming. The evidence covered everything from Sorenson's inability to obtain representation on a fixed-fee basis to the level of work and preparation such a case requires. Pennaco did not provide any evidence in opposing Sorenson's motion.

company must hire an attorney on a contingency fee basis, and in order to encourage firms to do so, a multiplier is needed."[21]

[¶62] Regarding the second factor to be considered in applying a multiplier, evidence indicated that Sorenson's attorneys had no way of mitigating the risk of nonpayment, as there was no surety of any kind. They were unable to hedge against the possibility that he could not pay his fees because Sorenson had no other means to pay for the substantial attorney time needed to prepare and try the case. The risks were great.

[¶63] From the start, Pennaco asserted it owed Sorenson nothing at all because it had assigned its rights under the surface damage agreement. That legal issue was not finally resolved by this Court until shortly before this appeal was argued, long after the attorneys had expended the vast majority of the time required to present Sorenson's claim. Beyond that, the spectrum of potential damages presented an additional risk Sorenson's attorneys took. Pennaco's experts testified that damages for reclamation totaled $150,000, while Sorenson's experts estimated it to be approximately $880,000, and it was for the jury to decide which, if either, was correct. The district court concluded that "[t]here was a high risk that the jury could have found Pennaco had not damaged the property, or they could have found a very low reclamation amount should be awarded." If the jury had gone along with Pennaco's figures, the shoe might have been on the other foot in terms of arguing the effect of the contingent fee agreement, because the contingent fee would have amounted to about half of what Sorenson's attorneys would have earned at their customary hourly rate.[22]

[¶64] As to other factors warranting the use of a multiplier, the district court was guided by those set forth by the United States Supreme Court, *see Perdue*, 559 U.S. at 554-55, as well as by the Florida Supreme Court, *see Quanstrom*, 555 So.2d at 834. It determined that the use of a 2.5 multiplier resulted in a reasonable attorney fee award because of the exceptional nature of the case, the amount involved, and the results obtained. It found that the damage award was nearly the largest possible amount that could have been attained given the disagreement between expert witnesses as to what the damages and reclamation costs would be. In the district court's words, the fact that counsel "was able

---

[21] The Florida Supreme Court has noted a primary rationale for the contingency risk multiplier is to provide access to competent counsel for those who could not afford it. *See Bell v. U.S.B. Acquisition Co., Inc.*, 734 So.2d 403, 411 (Fla. 1999) ("The importance of this policy consideration is highlighted by the fact that the very first factor listed in *Quanstrom* . . . is 'whether the relevant market requires a contingency fee multiplier to obtain competent counsel.'" (emphasis omitted)). "Multipliers are intended to level the playing field, to provide litigants, who may otherwise lack the resources, to obtain competent counsel, as a means of access to the legal system." *Michnal v. Palm Coast Dev., Inc.*, 842 So.2d 927, 934 (Fla. Dist. Ct. App. 2003) (emphasis omitted).

[22] The attorneys also ran the risk that Pennaco might become insolvent or bankrupt before a judgment could be collected.

to recover the large award of over a million dollars for Sorenson was the result of exceptional attorney work."

[¶65]  The court also recognized that the lodestar amount would not accurately represent Sorenson's actual attorney fees under the contingent fee agreement.  The attorneys were entitled to a 40% contingency by contract, and without enhancement, a large portion of Sorenson's damage award would have gone to his attorneys despite the fee-shifting provision of the surface use and damage agreement.

[¶66]  While the district court focused on Florida's approach to enhancing attorney fee awards when a contingent fee agreement is involved, we note that several other states also take that factor into account.  The Montana Supreme Court has confirmed that fees may be awarded on the basis of a contingent fee agreement, and indicated that other discretionary factors similar to the list in § 1-14-126(b) should also be considered before such an award is made.  *See West v. Club at Spanish Peaks, L.L.C.*, 186 P.3d 1228, 1247-48 (Mont. 2008).  Idaho takes a similar approach in allowing awards of fees when there is a contingent fee agreement, so long as the court considers other discretionary factors.  *See Griffith v. Clear Lakes Trout Co.*, 200 P.3d 1162, 1172 (Idaho 2009).  In Texas, whether a fee is fixed or contingent is also one of the discretionary factors to be considered.  *See Cleveland v. Taylor*, 397 S.W.3d 683, 701-02 (Tex 2012).  Oklahoma courts likewise recognize that the contingent nature of the attorney's employment allows a court to adjust the basic hourly rate upward by allowing a risk-litigation premium based on the likelihood of success at the outset of the representation.  *See Silver Creek Inv., Inc. v. Whitten Const. Mgmt.*, 307 P.3d 360, 369-70 (Okla. Ct. App. 2013).  Oregon courts have made it clear that an award of reasonable attorney fees does not preclude the use of a multiplier or other fee enhancement in contingent fee agreement cases.  *See ZRZ Realty Co. v. Beneficial Fire & Cas. Ins.*, 300 P.3d 1224, 1240-41 (Ore. Ct. App. 2013); *see also Strawn v. Farmers Ins. Co. of Oregon*, 226 P.3d 86, 95 (Ore. Ct. App. 2010).

[¶67]  After carefully studying the record and applicable law, we conclude that the district court's finding in favor of a multiplier of 2.5 is permissible by statute, and that it cannot be considered an abuse of discretion under the circumstances of this case.  However, we must echo the United States Supreme Court's caveat that a reasonable fee is one that is adequate to induce competent counsel to undertake representation in a meritorious case, but it should not result in a windfall.  *See Perdue*, 559 U.S. at 552.

## CONCLUSION

[¶68]  The district court did not err in determining that Pennaco continued to remain liable after assignment for the obligations under the surface damage and use agreement. The language of that contract plainly requires Pennaco to perform certain obligations until coalbed methane operations have ceased and the lands are reclaimed.  It does not

contain language indicating an agreement that Pennaco could be relieved of its obligations if it assigned them to a third party.

[¶69] Furthermore, the district court did not abuse its discretion by enhancing the lodestar amount by 2.5 times to arrive at a reasonable award of attorney fees. That enhancement was warranted under the circumstances of this case.

[¶70] Affirmed.