FILED
**United States Court of Appeals**
**Tenth Circuit**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

**July 14, 2025**

**Christopher M. Wolpert**
**Clerk of Court**

_____

TEAR DROP CATTLE COMPANY LLC,
a Wyoming limited liability company,

      Plaintiff - Counterclaim Defendant -
Appellee,

v.

DEVON ENERGY PRODUCTION
COMPANY LP, an Oklahoma limited
partnership,

      Defendant - Counterclaimant -
Appellant.

No. 24-8001
(D.C. No. 2:20-CV-00164-ABJ)
(D. Wyo.)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **MATHESON**, **MORITZ**, and **FEDERICO**, Circuit Judges.
_____

This appeal centers on a series of agreements allowing Devon Energy

Production Company LP (Devon) to extract coalbed methane gas from land

belonging to Tear Drop Cattle Company LLC (Tear Drop). Devon assigned those

agreements to other entities that then failed to make annual payments to Tear Drop.

As a result, Tear Drop sued Devon for breach of contract, and Devon counterclaimed,

seeking a declaratory judgment that the assignment extinguished its liability.

---

[*] This order and judgment is not binding precedent, except under the doctrines
of law of the case, res judicata, and collateral estoppel. But it may be cited for its
persuasive value. *See* Fed. R. App. P. 32.1(a); 10th Cir. R. 32.1(A).

While Devon's counterclaim remained pending, the assignees paid their debt to Tear Drop. As a result, the district court dismissed Tear Drop's claims against Devon as moot, but it granted summary judgment for Tear Drop on the counterclaim, concluding Devon remained bound under the agreements.

Devon appeals. Because we discern no error, we affirm.

## Background

Devon and Tear Drop entered into a series of agreements between 2000 and 2008 that authorized Devon to perform coalbed methane operations on Tear Drop's lands and entitled Tear Drop to payment for use of its lands.[1] In 2016, Devon assigned the agreements to U.S. Realm Powder River, LLC f/k/a Moriah Powder River, LLC (Moriah) and Moriah's affiliate Carbon Creek Energy, LLC (Carbon Creek). Moriah and Carbon Creek initially paid the amounts outlined in the agreements, but payments stopped in May 2019. Moriah filed for bankruptcy in October 2019.

In an effort to collect the missed payments, Tear Drop sent a notice of default to Devon in February 2020. When Devon failed to pay, Tear Drop filed suit against it in Wyoming state court to recover missed payments, seeking a monetary judgment and statutory penalties. Devon removed the case to federal court and filed a

---

[1] Collectively referred to as "the agreements," these included the (1) surface-use agreement, (2) treatment-site agreement, (3) produced-water agreement, (4) discharge-line-road agreement, and (5) road-use agreement. The surface-use agreement was the primary document allowing Devon to perform coalbed methane operations, while the others were secondary agreements created to facilitate that oil and gas extraction.

counterclaim against Tear Drop and Carbon Creek.[2] Devon's counterclaim sought, among other things, a declaratory judgment that "Carbon Creek assumed and is responsible for all obligations and payments under the [a]greements" and that Carbon Creek must "indemnify and hold harmless [Devon] for all damages and costs incurred in this action and for any future obligations arising out of the [a]greements." App. vol. 1, 59. Devon also sought declarations "that [it] is not liable for any future liabilities or breaches arising from the [a]greements," that Tear Drop "is precluded from bringing any such claims against [Devon]," and that the agreements were "cancelled and terminated . . . as to [Devon]." *Id.* In support, Devon contended that it "is not using, operating, or damaging the surface, roads, wells, pipelines, reservoirs, and facilities located on and under the lands owned by [Tear Drop] or covered by the [a]greements." *Id.*

Tear Drop moved for summary judgment on its claims against Devon. The district court granted that motion in February 2022 and entered final judgment. But the district court later rescinded its judgment after realizing that other claims remained pending. Tear Drop then moved for summary judgment on Devon's counterclaim. While that motion was pending, Carbon Creek paid the amounts due to Tear Drop under the agreements. Devon subsequently moved to dismiss both Tear Drop's claims and its own counterclaim as moot. Based on its view that the case was

---

[2] Devon also filed a third-party complaint against Moriah and Carbon Creek for breach of contract and contractual indemnity. The district court granted summary judgment to Devon on those claims, which are not at issue in this appeal.

moot, Devon also requested vacatur of the February 2022 summary-judgment order.

The district court granted Devon's motion to dismiss Tear Drop's claims as moot. But the court denied Devon's motion to dismiss its own counterclaim as moot, holding the counterclaim remained a live controversy. And because the counterclaim was viable, the district court denied Devon's motion to vacate the February 2022 summary-judgment order, noting that the prior order was "relevant, and ultimately dispositive, in addressing Devon's live counterclaim." App. vol. 5, 123. That same day, the district court granted Tear Drop's motion for summary judgment on Devon's counterclaim, holding that Devon remained liable for future payments due under the agreements, including statutory late-payment penalties.

Devon appeals each of these orders.

**Analysis**

Devon first challenges the district court's jurisdiction over its counterclaim, arguing that the district court erred in denying its motion to dismiss its counterclaim as moot. Further, Devon argues the district court erred in refusing to vacate its prior orders addressing these moot claims. We start there, and, agreeing with the district court that the counterclaim remained live, then delve into Devon's challenges to the merits of the summary-judgment order.

I.     **Mootness and Vacatur**

We review mootness challenges de novo. *Rio Grande Silvery Minnow v. Bureau of Reclamation*, 601 F.3d 1096, 1109 (10th Cir. 2010). And we review denials of motions to vacate for abuse of discretion. *Id.* at 1129.

4

### A.    Mootness

A federal court has jurisdiction only where there is a live case or controversy—in other words, where the claims are not moot. *Id.* at 1109. "A case becomes moot 'when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome.'" *Smith v. Becerra*, 44 F.4th 1238, 1247 (10th Cir. 2022) (cleaned up) (quoting *City of Erie v. Pap's A.M.*, 529 U.S. 277, 287 (2000)). On the other hand, a claim is live if a court's resolution of the issue would "have some effect in the real world." *Id.* (quoting *Citizens for Responsible Gov't State Pol. Action Comm. v. Davidson*, 236 F.3d 1174, 1182 (10th Cir. 2000)); *see also Jordan v. Sosa*, 654 F.3d 1012, 1025 (10th Cir. 2011) (noting plaintiff "must be seeking more than a retrospective opinion that [they were] wrongly harmed by the defendant").

Two more points about mootness are relevant to the case at hand. First, "[d]eclaratory[-]judgment actions must be sustainable under the same mootness criteria that apply to any other lawsuit." *Rio Grande*, 601 F.3d at 1109. Declaratory-relief claims remain live if judicial intervention will "affect[] the behavior of the defendant toward the plaintiff." *Id.* at 1110 (quoting *Cox v. Phelps Dodge Corp.*, 43 F.3d 1345, 1348 (10th Cir. 1994)); *see also Cox*, 43 F.3d at 1348 (noting plaintiff in declaratory judgment action must "demonstrate a good chance of being likewise injured by the defendant in the future" (cleaned up) (quoting *Facio v. Jones*, 929 F.2d 541, 544 (10th Cir. 1991))). Second, even if a court determines that certain claims in a suit are moot and dismisses them, counterclaims may remain live. *United States v.*

5

*Jenks*, 129 F.3d 1348, 1352–53 (10th Cir. 1997); *see also Powell v. McCormack*, 395 U.S. 486, 497 (1969) ("Where one of the several issues presented becomes moot, the remaining live issues supply the constitutional requirement of a case or controversy.").

Here, although the district court dismissed Tear Drop's breach-of-contract claims against Devon as moot, it found Devon's counterclaim remained live because it sought broader relief than payment of past amounts owed under the agreements. On appeal, Devon argues the district court erred in refusing to dismiss its counterclaims as moot because there were no outstanding payments owed under the agreements, and therefore, a declaratory judgment would lack "effect in the real world." *Rio Grande*, 601 F.3d at 1110.

But unlike Tear Drop's breach-of-contract claims, Devon's counterclaim is not limited to the past-due payments. Instead, recall that Devon sought a broad declaration that "the [a]greements [are] cancelled and terminated as to [Devon]." App. vol. 1, 59. Resolving whether Devon is entitled to this declaration has an effect in the real world and will affect Tear Drop's behavior towards Devon in the future because, depending on the outcome of the counterclaim, Tear Drop and Devon may remain in a contractual relationship. *See Guardian Life Ins. Co. of Am. v. Kortz*, 151 F.2d 582, 585 (10th Cir. 1945) (finding "actual controversy" on declaratory-judgment claim where parties disputed "whether there is now an existing contract").

Indeed, Devon's counterclaim itself recognizes that such a declaration will impact Tear Drop's future behavior toward it: the counterclaim expressly seeks, in

6

addition to cancellation, a related declaration that Tear Drop "is precluded from" suing Devon under the agreements. App. vol. 1, 59. And Devon even argued as much below, asserting that resolution of Tear Drop's claims focused on past payments and "did not address the broader questions [in the counterclaim] involving: successive and future payments; whether [Devon] can be held liable for those obligations and amounts; or [Devon's] ability to terminate or stop access under the [a]greements." App. vol. 4, 151.

Under these circumstances, the counterclaim is more than a "retrospective opinion" that Devon wronged Tear Drop by failing to pay in the past. *Jordan*, 654 F.3d at 1025. In fact, the record reflects "a good chance" that Tear Drop could sue Devon under the agreements again in the future, despite Devon's position that it is no longer party to the agreements, considering that Carbon Creek again failed to make payments due in October 2022 and that Moriah remains embroiled in bankruptcy proceedings. *Cox*, 43 F.3d at 1348 (quoting *Facio*, 929 F.2d at 544); *see also In re U.S. Realm Powder River, LLC f/k/a Moriah Powder River, LLC*, No. 19-20699 (Bankr. D. Wyo.). In sum, Carbon Creek's payment on the prior outstanding claims, despite mooting Tear Drop's breach-of-contract claims, is irrelevant to the question raised by Devon's counterclaim: whether Devon and Tear Drop currently are parties to an existing contract. Devon's counterclaim is therefore not moot.[3]

---

[3] The district court noted that even if the counterclaim was moot, it would likely meet the capable-of-repetition-yet-evading-review exception to mootness. *See Weinstein v. Bradford*, 423 U.S. 147, 149 (1975) (explaining exception is met where "(1) the challenged action was in its duration too short to be fully litigated prior to its

**B.      Vacatur**

Devon relatedly seeks vacatur of (1) the district court's order granting Tear Drop summary judgment on its breach-of-contract claims; (2) the district court's order granting Tear Drop summary judgment on Devon's counterclaim; and (3) the final judgment. A judgment should be vacated if a district court lacked subject-matter jurisdiction to enter it. *Rio Grande*, 601 F.3d at 1128. Since, as outlined above, Devon's counterclaim presents a live controversy, the district court had jurisdiction to grant Tear Drop summary judgment on that claim and enter the amended final judgment. Those orders should not be vacated.

Neither should the earlier February 2022 summary-judgment order addressing Tear Drop's breach-of-contract claims, even though those claims have become moot. For its argument to the contrary, Devon relies on our decision in *Rio Grande*, where we discussed a district court's equitable discretion to vacate interlocutory orders in cases that become moot. *Id.* at 1129–32. There, we recognized that "the appropriateness of vacatur must be determined 'on the basis of the particular circumstances.'" *Id.* at 1129 (quoting *McClendon v. City of Albuquerque*, 100 F.3d 863, 868 (10th Cir. 1996)). One circumstance in which vacatur may be appropriate is "when mootness results from happenstance or the actions of the prevailing party," rather than from the party seeking vacatur. *Id.* (quoting *Wyoming v. U.S. Dep't of*

---

cessation or expiration[] and (2) there was a reasonable expectation that the same complaining party would be subjected to the same action again"). Because we conclude that the counterclaim is live, we need not reach this issue.

*Agric.*, 414 F.3d 1207, 1213 (10th Cir. 2005)). In such an instance, vacatur can "'clear[] the path for future relitigation of the issues between the parties' and diminish[] the chances that the prior orders can be used for their persuasive value against any of the parties in subsequent proceedings." *Id.* at 1133 (quoting *McClendon*, 100 F.3d at 868).

Here, as Devon points out, Tear Drop's case became moot due not to its own actions or to Devon's actions, but because a third party paid the debt—a kind of happenstance that *could* support vacatur. *See id.* However, that happenstance did not *compel* the district court to vacate the prior order. Instead, the district court could exercise its discretion based on the "particular circumstances" involved. *Id.* at 1129 (quoting *McClendon*, 100 F.3d at 868). It did so here, declining to vacate its summary-judgment order because it was "relevant, and ultimately dispositive, in addressing Devon's live counterclaim." App. vol. 5, 123. Devon fails to explain how or why this rationale was unreasonable. Under these circumstances, the district court did not abuse its discretion when it declined to vacate its prior order granting Tear Drop summary judgment on its breach-of-contract claim.

## II. Summary Judgment on the Counterclaim

Because the counterclaim is not moot, we turn to its merits. We review summary-judgment orders "de novo, applying the same standard that the district court is to apply." *Doe v. Univ. of Denver*, 952 F.3d 1182, 1189 (10th Cir. 2020) (quoting *Singh v. Cordle*, 936 F.3d 1022, 1037 (10th Cir. 2019)). Summary judgment is appropriate where, viewing the facts in a light most favorable to the nonmoving

party, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.* (quoting *Evans v. Sandy City*, 944 F.3d 847, 852 (10th Cir. 2019)).

Devon contends summary judgment was inappropriate here because questions of fact remain as to whether assignment or novation relieved Devon of its obligations under the surface-use agreement. Devon further maintains it is not subject to the statutory penalties of Wyoming's Split Estate Act.[4] We address each argument in turn.

## A.    Assignment

Devon first argues the district court erred in concluding that the assignments did not relieve Devon of its obligations under the agreements. In Devon's view, it properly delegated its obligations under the surface-use agreement to Carbon Creek, so Tear Drop had no contractual right to seek payment from Devon. The parties agree that Wyoming law governs, so we turn to general Wyoming contract-interpretation principles.

Under Wyoming law, the court's "primary purpose is to determine the true

---

[4] We recognize that the district court addressed this issue as part of its analysis of Tear Drop's breach-of-contract claims—claims that we agree are moot. In its February 2022 order, the district court awarded damages to Tear Drop under the Wyoming Split Estate Act, which applies to oil and gas operators that fail to timely pay landowners. Wyo. Stat. Ann. § 30-5-405(b). Although these damages have been paid, the dispute remains live because Devon's counterclaim sought a declaratory judgment that Carbon Creek would indemnify Devon "for all damages and costs incurred in this action and for any future obligations arising out of the agreements" and that Devon "is not liable for any future liabilities or breaches." App. vol. 1, 59.

10

intent and understanding of the parties at the time and place the agreement was made." *Pennaco Energy, Inc. v. KD Co.,* 363 P.3d 18, 25 (Wyo. 2015) (*Pennaco I*). If the contract is clear and unambiguous, "we limit our inquiry to the four corners of the document, giving the words contained therein their ordinary meaning." *Id.* at 25–26 (quoting *Davidson Land Co. v. Davidson*, 247 P.3d 67, 71 (Wyo. 2011)). "[S]ummary judgment is appropriate only if the contract is clear and unambiguous." *Comet Energy Serv., LLC v. Powder River Oil & Gas Ventures, LLC*, 185 P.3d 1259, 1263 (Wyo. 2008) (quoting *Wolter v. Equitable Res. Energy Co., W. Region*, 979 P.2d 948, 951 (Wyo. 1999)). Otherwise, "[t]he meaning of specific terms and conditions and the intent of the parties generally are questions of fact to be resolved by the fact-finder." *Id.*

Also relevant for our purposes here is a critical distinction between contracts and servitudes. "Well[-]established principles of contract law dictate that a party who assigns [or] delegates a contractual duty remains responsible for performance of that duty." *Pennaco I*, 363 P.3d at 23. On the other hand, a servitude (such as an easement) creates obligations that "run with the land." *Id.* at 24. That means "the transfer of the land connected with the duty carries that duty to the assignee[] and relieves the assignor of future responsibility." *Id.*

Applying these legal principles, the district court relied primarily on two Wyoming Supreme Court cases holding that surface-use agreements related to oil and gas extractions were contracts with obligations that the oil and gas operators could not delegate to assignees. *See Pennaco I*, 363 P.3d at 29; *Pennaco Energy, Inc. v.*

11

*Sorensen*, 371 P.3d 120, 130 (Wyo. 2016) (*Pennaco II*). We recite the details of those decisions below, then apply them to the facts of this case.

In *Pennaco I*, the Wyoming Supreme Court identified several factors that indicate parties intended to create nondelegable contractual obligations instead of delegable servitudes. 363 P.3d at 29. First, *Pennaco I* noted that in the agreements at issue, the parties' rights and obligations were time-limited, indicating they were contracts, because servitudes are often perpetual. *Id.* Second, the agreements had no language indicating the operator's obligations would end upon assignment, which also suggested they were nondelegable contracts. *Id.* Third, the agreements were like mineral leases, and "leases continue to bind the original lessor even after an assignment." *Id.* Fourth, the operator made annual payments to the landowner that were "logically connected with the entire contract and project[,]" rather than "only the last assignee's use of the land." *Id.* Last, the operator's obligation to pay the landowner and reclaim[5] the land were connected to the operator's financial ability, so it was unreasonable to assume the parties would allow the operator to assign its obligations to "an entity of unknown financial ability." *Id.* at 29–30. In sum, these factors demonstrated that the parties created contractual obligations, not servitudes, and did not intend to relieve the operator of liability upon assignment.

---

[5] Reclamation occurs once oil and gas operations end, at which point the operator "restore[s] the land as nearly as possible to its prior condition." *Pennaco I*, 363 P.3d at 20.

12

*Pennaco II* also held that a surface-use agreement like the one at issue here was a contract, not a servitude. 371 P.3d at 129. The parties disagree about whether *Pennaco II* established a bright-line rule treating surface-use agreements like oil and gas leases. But as the district court noted, *Pennaco II* does contain language which could reasonably be interpreted to adopt such a bright-line rule: "oil and gas leases and surface agreements are of the same breed of contract." *Id.* at 130. Because surface-use agreements resemble oil and gas leases, *Pennaco II* explained that an operator may assign away liability only if (1) the agreement contains an exculpatory clause or (2) the landowner agrees to a novation. *Id.* at 130–31.

Based "on the straightforward application of *Pennaco II*," the district court determined that Devon remains liable to Tear Drop despite Devon's assignment to third parties because (1) the agreement lacks an exculpatory clause, and (2) Tear Drop did not agree to a novation. App. vol. 4, 42. Resisting this straightforward approach, Devon points out that the *Pennaco II* court also applied a *Pennaco I*-type analysis, carefully parsing the contract language to determine the parties' intent. Devon thus suggests that the district court erred by treating *Pennaco II* as a bright-line rule.

Devon's argument is unavailing. That's because the district court, like the *Pennaco II* court, conducted *Pennaco I*'s "more in-depth analysis" to conclude "the intent of the parties was not to create a servitude running with the land." *Id.* Specifically, the court noted that Devon's rights and obligations were time-limited and that the agreement contained no language indicating Devon's obligations ended

upon assignment. Most importantly, the court explained, Devon's payment obligations were to continue until reclamation, showing that Tear Drop relied on Devon's financial position when entering the agreement.

Nevertheless, Devon argues that a question of fact remains under *Pennaco I* about whether the parties intended for Devon to remain liable post-assignment. Devon first highlights that the agreement lacks any discussion about obligations ending after assignment. *See Pennaco I*, 363 P.3d at 29. According to Devon, this absence demonstrates that "the inquiry is one of unexpressed intent" such that "reasonable minds could differ as to the parties' intent." Aplt. Br. 23. We disagree. Rather than suggesting ambiguity, the omission of such language cuts the other way. *Pennaco I* expressly stated that if the parties wanted both rights and obligations to be transferrable, "we presume they would have included language to that effect in their agreement." 363 P.3d at 29; *see also Pennaco II*, 371 P.3d at 130 n.16 ("We can only enforce the intent reflected in the language of the agreement."). That no such language appears in the surface-use agreement thus suggests a nondelegable contract. *See Pennaco I*, 363 P.3d at 29.

Straining to avoid liability, Devon maintains that the parties intended to release it from obligations upon assignment because some of the agreements explicitly allow for assignment. For example, the surface-use agreement expressly allows for assignment and amendment by an assignee, while several others permit assignment with Tear Drop's written consent. But as we've discussed, "a party who assigns [or] delegates a contractual duty remains responsible for performance of that

14

duty." *Id*. at 23. So merely *allowing* for assignment doesn't demonstrate an intent to release Devon from liability as a result of such assignment.

The remaining *Pennaco I* factors also indicate that the parties intended to bind Devon. Many of the rights and obligations have specific ending dates, suggesting the agreements are contractual in nature. *See id.* at 29. For example, the treatment-site agreement prescribes a term of four years, while the surface-use agreement sets an initial term of two years. Additionally, the obligation to make annual payments is "logically connected to the obligor's financial ability and willingness to fulfill those responsibilities." *Id.* In fact, it would be illogical for Tear Drop to enter an agreement that Devon could later dodge through assignment to an entity "with an unknown financial ability." *Id.* Further, the agreements are based on oil and gas operations, rather than on land ownership, which also suggests they do not run with the land and, instead, are nondelegable contracts.[6] *See id.*

Finally, Devon attempts to distinguish *Pennaco I* by highlighting that the surface-use agreement requires annual payments to be made while the property is in use, rather than until it is reclaimed. To be sure, one of the agreements at issue in

---

[6] Devon notes that some of the agreements outline easements and rights of way, "categorical servitudes" that would be logically connected to only a current operator. Aplt. Br. 25. However, the fact that some agreements include language about easements is not dispositive, as the same was true of at least one of the agreements at issue in *Pennaco I. See* 363 P.3d at 31. Additionally, as the district court pointed out, that language must be read in context with the surface-use agreement itself because the other agreements "exist because of the overall operations created by" it. App. vol. 4, 41. And nothing in the surface-use agreement indicates an intent to enter into anything other than a traditional, nondelegable contract.

*Pennaco I* required the operator to make annual payments until reclamation was complete, rather than payments based on continued use. *Id.* But another surface-use agreement at issue in that case required payment until "the well permanently cease[d] production or the [o]perator ha[d] permanently ceased to use the road." *Id.* at 27. So just like Devon's contract with Tear Drop, the payments were tied to use—yet the *Pennaco I* court concluded that the original operator remained liable.

In sum, the district court correctly applied the *Pennaco* decisions to conclude that no factual issues about intent remained to preclude summary judgment.

### B.     Novation

Devon next argues the district court erred in granting summary judgment when questions of fact remained about whether a novation discharged Devon from its obligations. *Pennaco I* held that an operator could be "discharged from obligations . . . by novation, in which it transfers its duties to a third party with the landowner's consent." 363 P.3d at 37. "'[N]ovation is never presumed'; it must be affirmatively 'pleaded and proven' by the party asserting it." *TEP Rocky Mountain LLC v. Record TJ Ranch Ltd. P'ship*, 516 P.3d 459, 475 (Wyo. 2022) (quoting *Scott v. Wyo. Oils, Inc.*, 75 P.2d 764, 771 (Wyo. 1938)). The elements of novation are "(1) a previous valid obligation; (2) an agreement of all parties to a new contract; (3) extinguishment of the prior contract; and (4) validity of the new contract." *Lewis v. Platt*, 837 P.2d 91, 92 (Wyo. 1992).

As the elements above illustrate, a landowner's consent to assignment, standing alone, does not release the original operator. *See id.* At the same time,

16

however, a new formal agreement is not necessary; courts may infer novation based on the parties' conduct. *Id.* If a new operator is substituted in, the landowner must "make a clear manifestation of assent to the substitution of the new [operator] and release of the original [operator]." *TEP Rocky Mountain*, 516 P.3d at 475–76 (quoting 58 Am. Jur. 2d *Novation* § 13 (2022)). In some instances, whether a novation occurred is a question of fact, but it can be a question of law if the evidence demonstrates that no reasonable factfinder could conclude that a novation occurred. *Lewis*, 837 P.2d at 92–93.

Seeking to demonstrate that a fact question remains about novation, Devon relies on Tear Drop's cooperation with Moriah and Carbon Creek for years after assignment. However, as the district court held, no reasonable factfinder could conclude that a novation occurred in this case. *See id.* Devon bears the burden to demonstrate novation. *See TEP Rocky Mountain*, 516 P.3d at 475. And Devon has adduced no evidence of "an agreement of all parties to a new contract." *Lewis*, 837 P.2d at 92. Nor has Devon adduced any evidence to suggest "extinguishment of a prior contract." *Id.* Rather, Devon has shown only that Moriah and Carbon Creek adhered to the *original* agreement. And that does not meet the necessary elements of novation.

Nor could a reasonable factfinder infer novation by conduct. Devon has adduced no evidence demonstrating the "clear manifestation of assent" required by Wyoming law when a new operator is substituted for an original operator. *See TEP Rocky Mountain*, 516 P.3d at 475–76 (quoting 58 Am. Jur. 2d *Novation* § 13 (2022)).

17

To the contrary, for the assignments requiring consent, Tear Drop explicitly stated it would sign off only if Devon agreed to remain liable.[7] And Tear Drop's conduct after assignment further demonstrates its belief that Devon was bound. When an annual payment was late, Tear Drop contacted Devon. It did the same with a notice of default. Based on these facts, the district court did not err in concluding that Devon failed to carry its summary-judgment burden to demonstrate a dispute of material fact as to the existence of an express or implied novation.

## C.    Wyoming Split Estate Act

Last, Devon asserts the district court erred in finding that Devon remains subject to double-payment penalties under Wyoming law. The Wyoming Split Estate Act provides that "[a]n oil and gas operator who fails to timely pay an installment under any annual damage agreement negotiated with a surface owner is liable for . . . twice the amount of the unpaid installment if the" amount is not paid within 60 days of notice of failure to pay. Wyo. Stat. Ann. § 30-5-405(b). It defines an "operator" as "a person in *engaged in* oil and gas operations [or] his[ or her] designated agents, contractors[,] and representatives." *Id.* § 30-5-401(a)(v) (emphasis added). According to Devon, by using this language, the legislature intended to capture only entities currently engaged in operations—and the statute therefore does not capture Devon, a

---

[7] For these assignments, Devon relatedly argues that Tear Drop failed to expressly deny consent or declare breach, thereby waiving any provisions requiring written consent and effectively discharging Devon. Like many of its other arguments, this proceeds from Devon's flawed premise that assignment alone is sufficient to discharge an obligor from liability.

former operator.

The Wyoming Supreme Court has not yet weighed in on this question of statutory interpretation. In such instances, we "may seek guidance from decisions rendered by lower courts in the relevant state" to predict how the state supreme court would rule. *Wade v. EMCASCO Ins. Co.*, 483 F.3d 657, 665–66 (10th Cir. 2007). Tear Drop has submitted several decisions from lower Wyoming state courts showing that the courts consistently apply the Act to parties in the same position as Devon. *See, e.g.*, *Tear Drop Cattle Co. v. Andarako B&P Onshore LLC*, No. CV-2020-0046, slip op. at 9–10 (Wyo. Dist. Ct. Dec. 21, 2020) (holding defendant liable under Act even though it was not a current operator) (available at App. vol. 2, 179–92); *William P. Maycock II v. Anadarko E&P Onshore LLC*, No. 39277, slip op. at 6 (Wyo. Dist. Ct. Feb. 1, 2021) (same) (available at App. vol. 2, 194–200).

We agree with that approach. On matters of statutory interpretation, Wyoming courts examine "the ordinary and obvious meaning of the words employed according to their arrangement and connection." *Cabot Oil & Gas Corp. v. Followill*, 93 P.3d 238, 240 (Wyo. 2004) (quoting *Parker Land & Cattle Co. v. Wyo. Game & Fish Comm'n*, 845 P.2d 1040, 1042 (Wyo. 1993)). And, under Wyoming law, "[a] statute is not interpreted in a way that renders a portion of it meaningless or adds language to it." *Wyodak Res. Dev. Corp. v. Wyo. Dep't of Revenue*, 387 P.3d 725, 732 (Wyo. 2017).

Here, Devon's interpretation would require us to insert the word "currently" before the phrase "engaged in oil and gas operations." § 30-5-401(a)(v). Sparing

Devon from the Act also overlooks the statute's definition of "oil and gas operations," which includes "the full range of development activity from exploration through production and reclamation of the disturbed surface." § 30-5-401(a)(iv). Considering Devon cannot delegate its obligations and is ultimately responsible for reclamation, it fits comfortably within the definition of an operator. And, as the district court explained, Devon's interpretation contravenes public policy: the damages provision would become "practically obsolete if an oil and gas operator could escape double damages by simply leaving their operation prior to intended default or assigning their interests to an insolvent." App. vol. 4, 47. Therefore, the district court correctly concluded that Devon is subject to the Wyoming Split Estate Act.

## Conclusion

The district court properly denied Devon's motion to dismiss its own counterclaim as moot. Further, the district court did not abuse its discretion by denying Devon's motion to vacate its prior orders. Finally, the district court properly granted summary judgment to Tear Drop on Devon's counterclaim based on its conclusion that the agreements are nondelegable contracts, that no novation occurred, and that the Wyoming Split Estate Act applies to Devon.

Entered for the Court

Nancy L. Moritz
Circuit Judge